[No. H001095. Sixth Dist. Apr. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY EDWARD LOWERY, Defendant and Appellant.

COUNSEL

Manuel J. Baglanis, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BRAUER, J.—A jury found appellant Larry Edward Lowery guilty of the following offenses:

Count one: Conspiring with others to commit grand theft and to receive stolen property, between April 1, 1980, and May 28, 1982. (Pen. Code, §§ 182, 487, 496.)

Count two: Grand theft of integrated circuits from Monolithic Memories, Inc., between November 25 and November 28, 1981. (Pen. Code, §§ 484,

487.) The jury further found that the loss exceeded $100,000, within the meaning of Penal Code section 12022.6.

Count four: Attempting to receive and conceal stolen property on or about February 24, 1982. (Pen. Code, §§ 664, 496.)

Count five: Attempting to receive and conceal stolen property on or about May 18-19, 1982. (Pen. Code, §§ 664, 496.)

Count six: Attempting to receive and conceal stolen property on or about April 30, 1981. (Pen. Code, §§ 664, 496.)

Count seven: Receiving and concealing stolen computers, computer peripheral devices, typewriters, photocopy machines, calculators, jewelry, a bicycle, and integrated circuits, between August 30, 1980, and May 28, 1982. (Pen. Code, § 496.)[1]

Lowery was sentenced to a term of six years and eight months in the state prison. On appeal he contends (1) that his convictions were based solely upon uncorroborated testimony supplied by accomplices, and (2) that his constitutional right to counsel was violated when a conversation between himself and a codefendant was surreptitiously recorded.

We find no merit in either contention, and we therefore affirm the judgment.

## I. BACKGROUND

### A. *Prologue*

This case involves intricate and large-scale traffic in stolen integrated circuits, sometimes referred to as computer "chips." These electronic components were in great demand in 1980 and 1981, and a "gray market" developed for them. Thieves stole integrated circuits from companies that manufactured them, delivered the parts to a broker, and were paid for their services. The broker would then resell the stolen circuits at a profit to legitimate computer manufacturers.

What follows is a summary of the evidence presented at Lowery's trial.

---

[1] Lowery was found not guilty on count three, which accused him of receiving and concealing stolen integrated circuits between November 25, 1981, and May 28, 1982.

## B. *Brut Electronics*

In 1980 Lowery was the president of a company known as Brut Electronics, located in San Jose. Ostensibly the company was in the business of assembling circuit boards for personal computers. In reality Lowery did a lucrative business on the side, receiving and reselling stolen integrated circuits and other electronic components. The stolen parts were kept in a commercial storage locker, well away from the Brut premises.

In January of 1981 Larry Kizer, a longtime friend of Lowery's, began working at Brut. After a few weeks he discovered the illicit nature of the business. Several thieves regularly made nighttime deliveries of stolen components to Lowery's home, and Lowery asked Kizer to assist in making inventories of the parts. Lowery also provided Kizer with a key to the storage locker in which the stolen parts were kept. In addition to his regular salary Kizer earned cash bonuses for his after-hours work.

The inventories were used to compile lists of all of the components kept in the storage locker. The lists were typed up to resemble legitimate parts distributor lists, and were mailed to various component brokers in California, Texas, and Canada. During the daytime Kizer, at Lowery's direction, made telephone calls to brokers in an effort to sell the stolen components. When sales were made, parts were shipped with invoices. Some of those invoices bore the name of Offshore Consulting Services—a shadow company founded by Lowery—together with Lowery's own name and home address. Lowery retained complete control over the Offshore Consulting Services bank account, and used it to pay his network of thieves.

Sometime early in 1981, Kizer learned that in a case unrelated to this one, Lowery had been arrested and charged with receiving and concealing stolen integrated circuits. Lowery began to spend less and less time at Brut. Gradually Kizer assumed a larger role in the illicit enterprise. By the middle of 1981 Kizer was essentially running the enterprise for Lowery, but he continued to consult Lowery regularly on pricing and on major business decisions.

## C. *Advanced Micro Devices*

One of the consistent suppliers of stolen parts to Brut was a man named Abel Urbina, who was acquainted with both Lowery and Kizer. Urbina knew a man named Sidney Monge, who was employed at Advanced Micro Devices. Monge asked Urbina if he could sell him some stolen components. Urbina agreed, and informed Kizer that "he had an inside contact at AMD who could steal chips." Urbina furnished Monge with a list of components

he was interested in. Monge made one successful theft from Advance Micro Devices, and Urbina delivered those components to Kizer. Then a second theft was arranged for April 30, 1981. On that date Kizer and Urbina waited for Monge in a restaurant parking lot. But Monge was arrested while he was placing the stolen parts in his car. These latter events provided the basis for count six in the information.

### D. *National Semiconductor Corporation*

Urbina also knew a man named Christopher Thompson, who was a security supervisor at National Semiconductor Corporation. With Thompson's cooperation, Urbina and others removed integrated circuits by the truckload from the corporation's premises. There were perhaps a dozen such thefts, beginning in December of 1980 and extending over the next several months. Urbina notified either Lowery or Kizer of each theft, saying that he "expected some chips to come in." Then, because of a dispute about money, Thompson told Urbina he was no longer going to assist in the thefts. A few weeks later Lowery offered Thompson more money, and persuaded him to continue his criminal career. Thompson did so and, with the help of other security guards, assisted in five or six more thefts. At the end of August 1981, he left his employment with the corporation because he was afraid of being caught. But he continued to maintain contact with Urbina.

### E. *Other Thefts*

Brut Electronics did not deal solely in stolen electronic components. The network of thieves also provided stolen typewriters, stolen photocopiers, stolen calculators, stolen jewelry, and stolen bicycles. These items were kept in the same storage locker which contained the integrated circuits. They provided the basis for count seven of the information.

### F. *The Move to South Lake Tahoe*

In October of 1981 Lowery was preparing for trial on the earlier charges of receiving stolen circuits. About the same time, Kizer became engaged to a woman who lived and worked in South Lake Tahoe, and he contemplated removing himself to that area. After some discussion Lowery decided to form another company, Kingsbury Electronics, to be based in South Lake Tahoe. Kingsbury Electronics was to replace Brut in the fencing operations. The theft network would remain in San Jose; the stolen components would be shipped to Kizer in South Lake Tahoe; and Kizer would sell them under the aegis of Kingsbury Electronics.

Kizer moved to South Lake Tahoe in late October of 1981. Lowery was convicted of receiving stolen property on November 2, 1981. Kizer then made arrangements with a real estate agent—who managed real property for Lowery—to rent a storage locker in South Lake Tahoe. Between November 4 and November 7, 1981, using a rented U-Haul truck, Kizer moved the stolen merchandise from San Jose to storage locker number 45 in the Stor-Mor facility in South Lake Tahoe.

### G. *Theft From Monolithic Memories, Inc.*

Another of Urbina's contacts was Ronald Washington, who was employed as a security guard at Monolithic Memories, Inc. Washington devised a plan to steal large quantities of integrated circuits from Monolithic. He discussed the plan with Urbina, who in turn discussed it with Lowery. Lowery approved the plan, and it was agreed that the theft would occur over the Thanksgiving holiday weekend.

In the early morning hours of November 27, 1981, with Washington's help Urbina and several of his confederates loaded an automobile and a van full of Monolithic integrated circuits. The vehicles were driven to Lowery's house, where the components were unloaded and inventoried. At 6:07 a.m. Lowery telephoned Kizer in South Lake Tahoe and told him about the theft. He also told Kizer to be prepared to come and get the stolen parts, but to wait because more were coming.

Later that day Lowery made arrangements to have Urbina rent a U-Haul truck, in order to steal a greater quantity of parts. Early Saturday morning, November 28, Urbina and Washington loaded the truck with integrated circuits, and Urbina drove the truck to Lowery's house. When he arrived he saw a second U-Haul truck, which Lowery had rented, parked in the driveway. The second truck contained the components which had been stolen the night before. All the components from Urbina's truck were loaded into the second truck. At 1:27 a.m. Lowery again called Kizer in South Lake Tahoe, and told him to come to San Jose the following day to pick up stolen parts.

Kizer arrived in San Jose November 29, 1981. Lowery showed him the truck, and gave him a list of the components contained therein. He also provided Kizer with the truck rental documents. The next day, November 30, Kizer drove the truck to South Lake Tahoe, and unloaded the stolen components into storage locker number 45 at the Stor-Mor facility. Then he returned the truck to a U-Haul station in South Lake Tahoe. Lowery instructed Kizer not to dispose of the stolen components immediately, because the theft generated considerable publicity and the parts were too "hot."

Trial testimony established that the value of the components stolen from Monolithic exceeded $3 million. The Monolithic theft provided the foundation for count two in the information.

## H. *Lowery Goes to Prison*

In December of 1981, anticipating a prison sentence, Lowery laid plans for the continuation of his fencing operation. He and Kizer had a meeting in Redwood City with a Jeffrey Biggs, who was then in the Marine Corps and had previously been employed by Lowery. It was arranged that Biggs would run Brut Electronics and be the contact man for Kizer. Kizer gave Biggs a key to the Stor-Mor locker in South Lake Tahoe, and instructed him to move the components in the event of Kizer's arrest. Kizer also provided Biggs with a Dodge van, bearing Nevada license plates, which was registered to Kingsbury Electronics.

Lowery went to prison January 19, 1982. Biggs was discharged from the Marines January 21, and shortly thereafter became the link between Kizer and the network of thieves. But the traffic in stolen components dwindled, partly because Urbina took an extended vacation, and partly because manufacturers of components began using tighter security measures.

Lowery was incarcerated in the correctional facility at Susanville, California, described by Washington as a "country club." Kizer visited Lowery there on two or three occasions. When informed that there was very little stolen property coming in, Lowery told Kizer "to get the people busy." Kizer relayed this message to Biggs.

## I. *The First "Sting"*

A reward of $50,000 was offered for information leading to the location of the stolen Monolithic components. Ronald Washington, who had engineered that theft, confided his involvement to a friend, and the friend informed the authorities with a view toward claiming the reward. The friend introduced Washington to an undercover police officer. The officer told Washington that he had a friend at Synertek Corporation who would be willing to steal a large quantity of computer "chips." Washington in turn told the officer that he had a friend (meaning Urbina) who could fence the stolen chips. Washington contacted Urbina; Urbina telephoned Kizer; Kizer approved the purchase of the stolen circuits and instructed Urbina to get in touch with Biggs.

Investigators of the Monolithic theft believed that if Washington was given some marked integrated circuits, they could be traced to wherever the

Monolithic components were hidden. The undercover officer provided Washington with a quantity of integrated circuits borrowed from Synertek Corporation. On February 24, 1982, Washington met Biggs and Urbina at a restaurant in San Jose and gave them samples of the allegedly stolen circuits. Urbina paid Washington $2,000 for the samples, and Washington left the restaurant. Washington returned to a motel where he met the undercover officer and was promptly arrested. Meanwhile, at the restaurant Biggs tried to contact Kizer by telephone, without success. Finally Urbina was able to reach Kizer; and while Urbina was engaged in conversation with him on the telephone, both Urbina and Biggs were placed under arrest by surveilling officers. The original plan for tracing the Synertek circuits to the Monolithic circuits was abandoned because of traffic conditions and oncoming darkness.

The events of the first "sting" underlay count four of the information.

On February 25, 1982, a warrant was issued for a search of the premises at Brut Electronics. During the search officers discovered parts lists from Kingsbury Electronics. The lists matched some of the components that ultimately were recovered.

## J. The Second "Sting"

In March of 1982 Christopher Thompson, who had participated in the thefts from National Semiconductor Corporation, offered to cooperate with the authorities in order to secure leniency for Urbina. He agreed to participate in another "sting" operation. He made a series of telephone calls to Kizer, offering to sell him some stolen integrated circuits. Kizer agreed. The telephone calls were recorded by peace officers.

The officers arranged to borrow a van full of integrated circuits from National Semiconductor Corporation. On May 18, 1982, Kizer flew from South Lake Tahoe to San Jose. Biggs met him at the airport. They went to a bank where Kizer withdrew a large sum in cash, which he put in a satchel. Then they repaired to a restaurant. Thompson parked the van full of components in a lot across the street. Biggs had one of his confederates drive the van to an apartment in Redwood City, where the components were unloaded and counted. Then the van was returned to San Jose and parked. Biggs left the satchel of money under one of the van's seats. Biggs then drove Kizer back to the airport. Thompson picked up the van and drove it to the sheriff's office. The satchel proved to contain $8,000 in cash.

The next day officers observed Biggs and four confederates loading the National Semiconductor components into another van. The confederates

drove the van to a storage locker in Modesto, which Biggs previously had rented. As the confederates opened the door of the locker, officers placed them under arrest. Biggs heard about the arrests that evening.

The events of the second "sting" formed the basis for count five of the information.

## K. *The Loot Recovered*

On May 23, 1982, Biggs met with law enforcement officers and offered to cooperate with them in return for leniency for his arrested associates. He and an investigator drove to South Lake Tahoe, and Biggs pointed out storage locker number 45 at the Stor-Mor facility. A warrant was obtained and the locker was searched on May 28, 1982. Biggs provided a key to open the padlock on the locker. Among other things the locker contained (1) integrated circuits stolen from Monolithic Memories, Inc. and National Semiconductor Corporation, (2) computers stolen from Apple Computer, (3) calculators and typewriters stolen from Valley Office Supply, (4) IBM computer terminals stolen from Applied Microcomputer Technology, (5) integrated circuits stolen from Fairchild Camera and Instrument Company, (6) other circuits stolen from Televideo Systems, Inc., (7) typewriters stolen from Paul Masson Wineries, (8) a stolen bicycle, and (9) miscellaneous stolen jewelry.

Kizer was arrested May 28, 1982. Lowery was still in prison.

## II. CORROBORATIVE EVIDENCE

At trial Lowery did not testify. Kizer, Urbina, Washington, and Thompson all testified as witnesses for the prosecution. The trial court ruled that Jeffrey Biggs was unavailable as a witness, and allowed his previous preliminary hearing testimony to be read to the jury. The court instructed the jury that all five men were accomplices of Lowery as a matter of law, and that their testimony required corroboration. We need not pass on the correctness of these instructions, since any possible error favored rather than prejudiced Lowery. We shall assume that Kizer, Urbina, Washington, Thompson, and Biggs were all accomplices as a matter of law. (*People* v. *Perry* (1972) 7 Cal.3d 756, 769, fn. 3 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Cooks* (1983) 141 Cal.App.3d 224, 257, fn. 26 [190 Cal.Rptr. 211].)

Lowery now contends that apart from the testimony of accomplices, the evidence presented at trial was insufficient to sustain the charges against him. In other words, he claims that the accomplices were not sufficiently corroborated.

Penal Code section 1111 provides in pertinent part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

■ This state's highest court has summarized the rules relating to corroboration in the following way:

"To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation.] 'The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' [Citations.] 'Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant.' [Citation.] '[T]he corroborative evidence may be slight and entitled to little consideration when standing alone.' [Citation.]" (*People* v. *Perry, supra,* 7 Cal.3d at p. 769.) ■ Finally, "[u]nless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*Id.,* at p. 774, original italics, fn. omitted; accord, *People* v. *Szeto* (1981) 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213].)

■ The rules relating to proof of a conspiracy have also been summarized, as follows:

"To prove a conspiracy to commit a crime the prosecution need not show that the parties met and expressly agreed to commit a crime. [Citations.] The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.] Once there is prima facie evidence of a conspiracy, evidence of a conspirator's extrajudicial statements may be admissible to prove the conspiracy. [Citations.]

■ "Once the conspiracy is established it is not necessary to prove that each conspirator personally participated in each of several overt acts since members of a conspiracy are bound by all acts of all members committed in furtherance of the conspiracy. [Citations.] The crime of conspiracy can be committed whether the conspirators fully comprehended its scope, whether they acted together or in separate groups, or whether they used the same or different means known or unknown to them. [Citations.] Whether an individual conspirator's act was committed in furtherance of the conspiracy is a question of fact." [Citation.]

■ "The testimony of an accomplice is sufficient to establish the fact or existence of a conspiracy (the corpus delicti); his or her testimony needs corroboration only as to the defendant's connection with it. [Citations.] And, it is settled that only slight corroborative evidence is necessary to connect a defendant with the alleged conspiracy. [Citations.]" (*People* v. *Cooks, supra,* 141 Cal.App.3d 224, 311-312.)

■ With the foregoing principles in mind we turn to the case before us. The testimony of the five accomplices was sufficient to establish that a conspiracy to commit grand theft and to receive stolen property existed in fact. Evidence tending to show Lowery's connection with the conspiracy included the following:

First, Lowery made extrajudicial statements that he was the president of Brut Electronics. He represented himself as such to his real estate agent in South Lake Tahoe, who was not an accomplice. A police officer who arrested Lowery in 1980 also testified that Lowery was president of the company. On October 15, 1981, another officer, investigating a homicide, interviewed Lowery at his home. At that time Lowery told the officer that he, Lowery, was "involved in the business from my house." A secretary employed at Brut testified that Lowery "ran" the company.

Second, Lowery introduced Kizer to his real estate agent, and told the agent that Kizer was "a partner or associate" in his corporation.

Third, the manager of a U-Haul rental agency testified that he rented a 14-foot truck to Lowery in the afternoon of November 27, 1981 (the date the first load of components was stolen from Monolithic Memories, Inc.). The truck was rented for three days, and was expected to make a 300-mile journey. The truck was returned to a U-Haul agency in South Lake Tahoe on November 30, 1981. It had travelled 252 miles. Truck rental documents bearing Lowery's signature were admitted in evidence.

Fourth, by means of a search warrant the prosecution obtained telephone company records of long distance calls made from Lowery's home in San

Jose to Kizer's home in Nevada. One such call was made on Friday, November 27, 1981, at 6:07 a.m. Another call was made on Saturday, November 28, 1981, at 1:27 a.m. The records corroborated Kizer's testimony as to how he learned of the theft from Monolithic Memories, Inc.

Fifth, during the first "sting" operation accomplice Washington told an undercover officer that the broker who was to receive the stolen components was then incarcerated in "a country club type prison somewhere in Northern California." Independent evidence established that Lowery was at that time the only integrated circuit broker in the state prison system.

Sixth, when Urbina was arrested on February 24, 1982, he was driving a Lincoln automobile registered to Lowery. According to Urbina, Lowery had given him the automobile in part payment for his services in the Monolithic theft. A peace officer testified that he had previously seen Lowery driving the same automobile. The officer further testified that after Urbina had been arrested, Lowery's girl friend, who had a power of attorney from Lowery, "signed over the documents transferring the vehicle to Abel Urbina."

Seventh, when Kizer was arrested on May 28, 1982, his briefcase contained documents written in Lowery's handwriting. One document contained a notation "2500K to OCS." A peace officer identified Offshore Consulting Services (OCS) as "a briefcase business run by Mr. Lowery." Another document instructed Kizer to contact Lowery's lawyer about retrieving documents seized in the search of the Brut Electronics premises.

The foregoing evidence was properly admitted and reasonably tended to connect Lowery to the conspiracy. Consequently we cannot disturb the jury's implied finding on the issue of corroboration.

■ "Generally, a defendant's mere failure to continue previously active participation in a conspiracy is not enough to constitute withdrawal. An affirmative and bona fide rejection or repudiation of the conspiracy must be communicated to the coconspirators. [Citation.] Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy. [Citation.] [¶] Although a defendant's arrest and incarceration may terminate his participation in an alleged conspiracy, his arrest does not terminate, or constitute a withdrawal from, the conspiracy as a matter of law. [Citations.] Withdrawal from, or termination of, a conspiracy is a question of fact. [Citation.]" (*People v. Cooks, supra,* 141 Cal.App.3d at p. 316.)

In this case no evidence was adduced to demonstrate that Lowery effectively withdrew from the conspiracy. Indeed, the handwritten documents found in Kizer's briefcase suggest otherwise. Consequently the jury could reasonably find that Lowery remained a member of the conspiracy even while in prison. ■ A member of a conspiracy is bound by all acts of all members committed in furtherance of the conspiracy. (*Id.,* at p. 312.) If one conspirator in furtherance of a conspiracy does an overt act which amounts to a substantive offense, he and other conspirators may be prosecuted both for conspiring and for committing the substantive offense. (*Pinkerton* v. *United States* (1946) 328 U.S. 640, 647 [90 L.Ed. 1489, 1496-1497, 66 S.Ct. 1180].)

The evidence was sufficient to support the verdicts.

## III. RIGHT TO COUNSEL

■ Lowery next contends that his constitutional right to counsel was violated when a conversation between himself and Kizer was clandestinely recorded. In order to evaluate this contention we must relate further background.

Before Lowery's previous trial for receiving and concealing stolen property—which took place in October of 1981—there was a witness named Dave Roberts. Roberts was a thief, i.e., a supplier of stolen integrated circuits, like Urbina. Roberts was expected to testify for the prosecution at Lowery's previous trial. But before that trial began Roberts was assassinated in San Mateo County. The assassins later proved to be Jeffrey Biggs and Wally Diaz. Both Biggs and Diaz pled guilty to first degree murder. Ultimately Lowery pled guilty to being an accessory after the fact of that murder.

Despite the demise of Roberts, Lowery was convicted of receiving stolen property on November 2, 1981, and was sent to prison. In May of 1983 he was released on parole. He then began to face this case, and retained an attorney to represent him.

In this action Kizer originally was accused as a codefendant of Lowery. Kizer did not like the idea of going to prison, and so he asked his attorney if he would receive any benefit from supplying information about the Roberts homicide. His attorney made inquiries. On July 7, 1983, a meeting was held in the attorney's office. Kizer, his attorney, peace officers from Santa Clara and San Mateo counties, and a deputy district attorney named Douglas Southard were all present. The conversation focused almost entirely on the details surrounding the Roberts homicide. In return for this information

Kizer ultimately was given (1) immunity for his part in the homicide, and (2) a plea bargain in this case.

From time to time Lowery suggested to Kizer that Kizer should take the witness stand in this action, testify that he alone ran the fencing operation, and tell the jury that Lowery knew nothing of that operation. In other words, Lowery wanted Kizer to give up his right to remain silent and to perjure himself. Kizer was not keen on the idea. But because Lowery persisted, Kizer agreed to allow a conversation between himself and Lowery to be tape-recorded by peace officers.

Lowery and Kizer met in a motel room on February 6, 1984. At that time Lowery had not been accused of committing the Roberts homicide. The motel room was bugged and Douglas Southard overheard the conversation. We need not recount everything that was said. It suffices to say that Lowery made a number of damaging admissions concerning his involvement in this case, and revealed very little about his connection with the Roberts homicide. He also renewed his efforts to persuade Kizer to take the entire blame for running the fencing operation and to exonerate Lowery at trial.

When Lowery's counsel ultimately learned that the conversation between Lowery and Kizer had been recorded and transcribed, he made pretrial motions (1) to recuse Southard as the prosecuting attorney, and (2) to dismiss the action under Penal Code section 1385. Both motions were founded on the contention that the taping of the motel room conversation violated Lowery's constitutional right to counsel.

The court held an evidentiary hearing. Kizer testified that a few days before the motel room meeting he consulted with Southard. Kizer's principal concern was how he could steer his conversation with Lowery to the topic of the Roberts homicide. He asked Southard's advice on the point. According to Kizer, Southard told him to do the best he could. Kizer said Southard did not ask him to obtain information on Lowery's legal defense.

For his part, Southard testified that he instructed Kizer "don't put words in Mr. Lowery's mouth," and to try to steer the conversation to the topic of the Roberts homicide. When Kizer asked how this might be done without arousing Lowery's suspicion, Southard testified "I just suggested that it's going to have to be basically left to your own intuition, conversational skill . . . ." Southard also said that "[t]he purpose of the anticipated undercover thing with Mr. Kizer was solely for the purpose of investigating the homicide and other assaults on other witnesses in previous cases and people associated with Lowery, solicitation of perjury, things of that nature." Southard further testified that in preparing for trial in the case now before

us, he did not use any evidence that was developed directly or indirectly from the Kizer-Lowery conversation.

The court denied both defense motions. At trial the transcript of the taped conversation was not offered in evidence, nor was it mentioned to the jury. Neither Kizer nor any other witness testified about the conversation in the motel room. From all that appears in the record, the jury remained totally ignorant of it.

Nevertheless Lowery argues that the foregoing events compel us (1) to reverse with directions to dismiss the case entirely, or in the alternative, (2) to order a new trial, with a different prosecutor from a different district attorney's office. Lowery cites a number of cases, which we now pause to examine.

We begin with *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. In that case defendant Massiah, a merchant seaman, transported a quantity of narcotics aboard a ship from South America to the United States. Subsequently Massiah and a man named Colson were indicted on federal narcotics charges based on the shipment. Massiah, who had retained a lawyer, pled not guilty and was released on bail, along with Colson. A few days later, without telling Massiah, Colson decided to cooperate with government agents. Colson allowed the agents to install a radio transmitter in his car. On a November evening in 1959, while parked on a New York street, Colson and Massiah had a lengthy conversation during which Massiah made several incriminating statements. An agent parked out of sight down the street listened over the radio to the entire conversation. At Massiah's trial the incriminating statements were brought to the jury's attention through the testimony of the agent. The jury convicted Massiah of several narcotics offenses, and the convictions were affirmed by the circuit court of appeals.

The United States Supreme Court reversed, holding that Massiah had been deprived of his Sixth Amendment right to the assistance of counsel. "We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (*Id.,* at p. 206 [12 L.Ed.2d at p. 250].) The government argued that it had not only the right but the duty to continue to investigate Massiah, in order to discover the source of the narcotics, and also their intended buyer. To that argument the court replied: "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even

though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." (*Id.,* at p. 207 [12 L.Ed.2d at p. 251], italics in original.)

Two aspects of *Massiah* are worthy of note. First, the case against Massiah was not dismissed, but instead reversed. Second, the court's opinion plainly states that when government agents illegally obtain post-indictment incriminating statements, the proper remedy is suppression of those statements at the defendant's trial.

*Massiah* was followed in *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]. There defendant Henry was indicted for bank robbery, and a lawyer was appointed to represent him. While awaiting trial Henry was placed in a cellblock which also housed a man named Nichols, a convicted forger and a paid informant for the Federal Bureau of Investigation. Nichols told his supervising agent that Henry was in his cellblock. The agent told Nichols to be alert to any statements Henry made, but not to initiate any conversation with or question Henry about the bank robbery. Shortly thereafter, after he had been released from jail, Nichols told the agent that Henry had told him the details of the robbery. Nichols testified at Henry's trial, and Henry was convicted. After his conviction he learned of Nichols's capacity as a paid government informant, and moved to set aside his conviction on the ground that his Sixth Amendment right to the assistance of counsel had been violated because he had been intentionally placed in the same cell with Nichols so that Nichols could obtain information about the robbery. The federal district court denied the motion. The circuit court of appeals reversed and remanded, holding that if Nichols "had developed a relationship of trust and confidence with Henry such that Henry revealed incriminating information, this constituted interference with the right to the assistance of counsel under the Sixth Amendment." (*Id.,* at p. 269, fn. omitted [65 L.Ed.2d at p. 121].)

The United States Supreme Court upheld the judgment of the circuit court of appeals. The government argued that Henry's incriminating statements had not been "deliberately elicited," as in *Massiah,* because the agent had specifically told Nichols not to interrogate Henry. But the high court rejected that argument, and held: "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." (*Id.,* at p. 274, fn. omitted [65 L.Ed.2d at p. 125].)

*Massiah* was reaffirmed in *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477]. In that case defendant Moulton and codefen-

dant Colson[2] were indicted for receiving stolen property. Both retained counsel. Thereafter both men met at a restaurant, where Moulton suggested the possibility of killing a prosecution witness and discussed with Colson how to commit the murder. Thereafter Colson decided to cooperate with the police. He made a full confession of his own participation in the crimes for which he was indicted, and told the police of Moulton's inchoate plan for the murder of the witness. At a subsequent meeting with Moulton, Colson was equipped with a body wire transmitter to record the conversation. During the course of the conversation the plan for murder was discarded, but Moulton made a number of incriminating statements. Colson prompted many of those statements by pretending to have a poor memory of the details of the crimes. At Moulton's trial portions of the tape containing the incriminating statements were introduced in evidence, and Moulton was convicted. He appealed on the ground that the admission into evidence of his statements to Colson violated his Sixth Amendment right to the assistance of counsel. The Supreme Judicial Court of Maine reversed and remanded for a new trial.

The United States Supreme Court affirmed. The government sought to justify the clandestine recording by arguing, among other things, that it had a legitimate interest in investigating Moulton's plan for murder, a crime for which he was not indicted. The high court rejected this argument, reaffirming *Massiah*. (*Maine* v. *Moulton, supra,* 474 U.S. at p. 179 [88 L.Ed.2d at p. 498, 106 S.Ct. at p. 489].) "Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." In footnote 16 the court added: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not attached, are, of course, admissible at a trial of those offenses." (*Maine* v. *Moulton, supra,* 474 U.S. at p. 180 [88 L.Ed.2d at pp. 498-499, 106 S.Ct. at pp. 489-490].)

Lowery urges us to note the similarities between the foregoing cases and the case before us. We note instead the salient difference. In each of the cited cases the defendant's recorded incriminating statements were used against him at trial. In this case the statements made by Lowery to Kizer in the motel room were never mentioned at trial. In other words, the rule enunciated in *Massiah, Henry,* and *Moulton* was strictly adhered to by the prosecution.

---

[2] The Colson in *Moulton* is not related to the Colson in *Massiah*. (*Maine* v. *Moulton, supra,* 474 U.S. at p. 172, fn. 8 [88 L.Ed.2d at p. 493, 106 S.Ct. at p. 485].)

Undaunted, Lowery points to *United States* v. *Levy* (3d Cir. 1978) 577 F.2d 200. There several defendants were indicted for conspiring to distribute heroin. One of the defendants, named Visceglia, was an informant for the Drug Enforcement Administration (DEA). Visceglia and another defendant, Verna, were represented by the same attorney, named Siegal. Visceglia thus became privy to conversations between Verna and Siegal. "[¶] To summarize, the district court found that the DEA, which at all times was aware that its informer was represented by the attorney for a co-defendant, attempted to obtain information about the present matter and, at the very least, did learn that the defense strategy would be to concentrate on the credibility of two key government witnesses. The reference in the district court's opinion to Visceglia's quotation of Siegal regarding the credibility of Logan and Morris [the government witnesses] is a reference to discussions in which Verna, Siegal, and Visceglia all participated. Moreover, . . . the record establishes unequivocally that not only the DEA agents but also prosecutor Fields became privy to this strategy." (*Id.,* at pp. 204-205, fn. omitted.) Defendant Levy, pursuant to a plea bargain, pled guilty. Defendant Verna was tried by a jury and convicted. The opinion does not disclose whether Visceglia testified at Verna's trial.

The Third Circuit Court of Appeals reversed with directions to dismiss the indictment. Among other things the court said this: "[¶] Where there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is." (*Id.,* at p. 208.) "We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society." (*Id.,* at p. 209.) "Since in this case an actual disclosure of defense strategy occurred and since we reject the proposed rule that the damage done by such disclosure should be weighed on a case-by-case basis, we must consider what remedy is appropriate. In our judgment, the only appropriate remedy is the dismissal of the indictment." (*Id.,* at p. 210.)

A similar case is *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], also cited by Lowery. In that case approximately 50 defendants participated in a "sit-in" near the site of the Diablo Canyon nuclear facility, and were arrested for trespassing and unlawful assembly. One of the defendants was an undercover deputy sheriff. He attended several meetings between other defendants and their counsel, and

learned of various defense strategies. He communicated this information to his superiors. When his true capacity became known, defense counsel moved to dismiss the complaints. The trial court denied the motion, but ordered the prosecution not to use any evidence obtained or developed from the information supplied by the undercover officer. The defendants applied for a writ of prohibition. The California Supreme Court granted the writ, and ordered the complaints dismissed. The court based its decision entirely on California law, specifically article I, section 15 of the California Constitution. "[T]he right to counsel guaranteed by the California Constitution embodies the right to communicate in absolute privacy with one's attorney." (*Id.*, at p. 751.) "[T]he right to privacy of communication between an accused and his attorney has consistently been grounded on California law." (*Id.*, at p. 755.) "[¶] The right under California law to communicate privately with counsel was violated when a government agent in an undercover capacity was present at confidential attorney-client meetings." (*Id.*, at p. 756, fn. omitted.) The court decided that dismissal was the appropriate remedy because "[a]n exclusionary remedy is not only ineffective as a deterrent, but the problems of proof inherent in the remedy when applied to violations of the right to counsel would be inadequate to assure that the prosecution does not benefit from the illegality." (*Id.*, at p. 759.)

The case at bench is distinguishable from *Levy* and *Barber* for two reasons. First, the taping of the Lowery-Kizer conversation did not in any way impair Lowery's right or ability to consult privately with his counsel. Second, while Lowery argues that defense strategy was revealed, our independent reading of the conversation transcript discloses that the only "strategy" discussed was that of lying under oath. The proposed "strategy" was that Kizer should testify falsely on the witness stand so as to favor Lowery, a design which the prosecution was virtually assured would not, and apparently did not, happen. And as we noted at the outset of part II of this opinion, Lowery himself did not testify. Thus, we do not see how the conversation could have aided the prosecution in any manner.

Both *Levy* and *Barber* were decided before *United States* v. *Morrison* (1981) 449 U.S. 361 [66 L.Ed.2d 564, 101 S.Ct. 665]. Morrison was indicted on two counts of distributing heroin, and she retained private counsel. Thereafter two agents of the Drug Enforcement Agency, who were aware she was represented, met and conversed with her without the knowledge or consent of counsel. The agents sought to obtain her cooperation in a related investigation. They also disparaged the legal ability of her lawyer. Morrison declined to cooperate and immediately notified her attorney. "The agents visited [Morrison] again in the absence of counsel, but at no time did [she] agree to cooperate with them, incriminate herself, or supply any information pertinent to her case. Contrary to the agents' advice, [she] continued to

rely upon the services of the attorney whom she had retained." (*Id.,* at pp. 362-363 [66 L.Ed.2d at pp. 566-567].) Subsequently Morrison moved to dismiss the indictment on the ground that the conduct of the agents violated her Sixth Amendment right to counsel. The district court denied the motion. Morrison entered a conditional plea of guilty to one count of the indictment. She then appealed to the Third Circuit Court of Appeals, the same court which decided *Levy.* That court decided that Morrison's right to counsel had been violated, and that the appropriate remedy was dismissal of the indictment with prejudice.

The United States Supreme Court reversed the decision of the court of appeals. "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. Our relevant cases reflect this approach. . . . [W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted." (*United States* v. *Morrison, supra,* 449 U.S. at pp. 364-365 [66 L.Ed.2d at p. 568].) "The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial." (*Id.,* at p. 365 [66 L.Ed.2d at pp. 568-569].) "The Sixth Amendment violation, if any, accordingly provides no justification for interfering with the criminal proceedings against respondent Morrison, much less the drastic relief granted by the Court of Appeals." (*Id.,* at pp. 366-367, fn. omitted [66 L.Ed.2d at p. 569].)

In this case Lowery has made no attempt to demonstrate how he suffered any prejudice from the taping of his conversation with Kizer. Instead, he merely argues that such prejudice ought to be presumed. In the light of *Morrison* we cannot agree. Absent demonstrable prejudice, or substantial threat thereof, dismissal of the information is plainly inappropriate.

Like reasoning persuades us that a new trial with an independent prosecutor is also inappropriate. ▪▪▪ Penal Code section 1424 provides that recusal of a prosecuting attorney "shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." Our state's highest court has

held that "a 'conflict,' within the meaning of section 1424, exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." (*People* v. *Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5].) Lowery has made no showing that the prosecutor made any use of the information he obtained from the tape, or that he failed to act in an evenhanded manner. We cannot discern that a prosecutor's nonuse of illegally obtained evidence amounts to a conflict of interest.

## IV. DISPOSITION

The judgment is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied May 19, 1988, and appellant's petition for review by the Supreme Court was denied July 28, 1988.