[No. B046898. Second Dist., Div. Three. Mar. 18, 1991.]

THE PEOPLE, Plaintiff and Appellant, v.
DAVID WAYNE SCONCE, Defendant and Respondent.

COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Respondent.

OPINION

KLEIN, P. J.—The People filed an information charging defendant and respondent David Wayne Sconce (Sconce) with conspiracy to commit murder. (Pen. Code, §§ 182, 187, subd. (a).)[1] The trial court set the information aside because it found Sconce effectively had withdrawn from the conspiracy. (§ 995.) The People appeal. (§ 1238, subd. (a)(1).)

Because withdrawal cannot insulate Sconce from criminal liability for conspiracy after an overt act in furtherance of the conspiracy has been committed, the order must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Preliminary hearing testimony.*

This case involves Sconce's alleged formation of a conspiracy to kill Elie Estephan (Estephan).

In 1985 Estephan and Cindy Strunk (Cindy) were separated. Cindy testified she worked for her father, Frank Strunk, at his business, the Cremation Society of California (CSC). In the course of her duties at CSC, she met Sconce whose family owned the Lamb Funeral Home (LFH) and the Pasadena Crematorium. In 1985, Cindy met Sconce's brother-in-law, Brad Sallard (Sallard). She and Sallard dated and began to live together in May 1985.

---

[1] All further statutory references are to the Penal Code.

When Estephan served divorce papers on Cindy in June, 1985, Sconce offered her the services of LFH's attorney. Sconce and Sallard accompanied Cindy to the first meeting with the lawyer. One of the assets she mentioned during the meeting was a $250,000 insurance policy on Estephan's life which named her as beneficiary.

At some point thereafter, Cindy argued with Estephan at CSC in front of Frank Strunk and others including an LFH employee, John Pollerana (Pollerana). Estephan chased Cindy and pushed her down a number of stairs. She was upset but not hurt.

Pollerana testified that in late summer of 1985, the day after the argument between Estephan and Cindy, Sconce asked Pollerana "if he gave me $10,000, would I get rid of Elie [Estephan], but, you know, I just shook my head, and we just walked by. That was the end of the conversation."

Pollerana further testified Sconce did not like Estephan because he had slapped Cindy. Sconce referred to Estephan, an Arab, as a " 'sand nigger.' " Pollerana did not take Sconce's offer seriously. However, two weeks later Pollerana had a conversation with Bob Garcia (Garcia) in which Garcia said Sconce had offered him $10,000 to kill Estephan. Pollerana told Garcia, " 'I wouldn't do it.' " A few days later, Garcia showed Pollerana the address to Estephan's house and Pollerana drove Garcia there.

Garcia testified he also worked for Sconce. One day at the crematorium Sconce asked Garcia "about someone being murdered, and if I knew anyone who would do it." Sconce told him "a friend wanted someone killed." Sconce offered Garcia $10,000 or $15,000 to commit the murder. Garcia told Sconce he would either find someone to do it or that he would do it himself.

In a telephone conversation a few days later, Sconce told Garcia that Estephan "had a large insurance policy and he just wanted him murdered to collect the insurance money." Sconce gave Garcia the impression that Sconce, Sallard and Cindy were plotting Estephan's murder.

Approximately one week later Sconce and Garcia went to a Jack-In-The-Box across the street from Estephan's gas station. CSC is on another corner of the same intersection. They sat next to the window and, as they ate lunch, Sconce used binoculars to point Estephan out to Garcia. Sconce later gave Estephan's address to Garcia. One night shortly thereafter, Garcia and Pollerana drove to Estephan's house.

Garcia then contacted Herbert Dutton (Dutton), an ex-convict who lived next door to him, about committing the offense. Dutton agreed to do the job

for $5,000. That same night Garcia and Dutton drove to Estephan's house. On the way there they discussed whether to blow up Estephan's car or shoot him on the freeway. They settled on the former because Dutton had explosives and no one would have to pull the trigger. They intended to plant the bomb, run a wire to it from three houses away, and wait for Estephan.

Conversations between Sconce and Garcia about the matter were brief but continued over a three-week period. Sconce would ask Garcia, "Is he still walking today[?]" Garcia would respond that "we" would take care of it. Approximately three weeks after Sconce's initial conversation with Garcia, Sconce "just called it off. He said just forget about it, disregard doing it." Garcia did not see Dutton after the night they drove to Estephan's house. Although Garcia did not know it at the time Sconce told him not to kill Estephan, Dutton had been arrested on a parole violation.

Dutton testified that in mid-September, 1985, Garcia asked him if he knew anyone who would kill someone his boss wanted killed. Dutton said he would do it for "about $2,500." Dutton suggested explosives or a 12-gauge shotgun. That same evening they drove to the home of the victim "to see if it would be suitable to wire the car out there." Dutton told Garcia to give him half the money up front and to let him know. However, Dutton, who was on federal parole for bank robbery, was arrested for parole violation stemming from heroin abuse shortly after discussing the matter with Garcia. Dutton did not see Garcia again after that night and had never met Sconce.[2]

Frank Strunk testified that sometime after the argument between Cindy and Estephan at CSC, he saw Sconce and another person at the Jack-In-The-Box across the street from CSC making gestures and looking at Estephan through binoculars. Frank Strunk went to the restaurant and asked Sconce why he was watching Estephan. Sconce said he was just pointing out the gas station. Frank Strunk told Cindy about this incident.

Cindy testified that after speaking with her father, she confronted Sallard and asked him why Sconce had been looking at Estephan with binoculars. Sallard made statements to her which the trial court excluded as hearsay. However, after this conversation, Cindy feared for her life and left Sallard immediately. Sallard told her not to repeat their conversation, that no one would believe her, and that if she did repeat it she would have to "watch . . . [her] back."

[2] Pollerana, Garcia and Dutton testified under grants of immunity and are not parties to this appeal.

## 2. *Court rulings.*

The magistrate held Sconce to answer, and the People filed an information alleging conspiracy to commit murder. The information asserted six overt acts committed between September 1 and 16, 1985. These acts consisted of Sconce's pointing out Estephan at the Jack-In-The-Box, the use of binoculars to view Estephan, Garcia's trip to the Estephan home with Pollerana, the solicitation of Hutton by Garcia, Garcia's trip to the Estephan home with Hutton, and Sconce's inquiries of Garcia to " 'take care of' and kill" Estephan.

Thereafter, notwithstanding the trial court's finding there had been a conspiracy, it granted Sconce's motion to set the information aside. The trial court stated it could find no authority on point but "Witkin and Epstein [(1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 180, p. 200)] seem to follow the general policy of encouraging withdrawal from conspiracies [and it] is a good one. [¶] . . . . [¶] It seems to me that David Sconce['s] withdrawal here was an effective one."

This appeal followed.

## CONTENTIONS

The People contend the trial court erroneously set aside the information because Sconce's withdrawal from the conspiracy, although it might insulate him from liability for future conspiratorial acts, does not constitute a defense to liability for the conspiracy itself. Further, the People assert Sconce failed to demonstrate effective withdrawal from the conspiracy.

## DISCUSSION

## 1. *Standard of review.*

■ "An information will not be set aside if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citation.] 'On a motion to set aside an information, the question of the guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a [person] of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated.' [Citation.] Neither the trial court in a section 995 proceeding [citations] nor a reviewing court on appeal therefrom [citations] may substitute its judgment as to the

weight of the evidence for that of the committing magistrate. 'Although the magistrate, in reaching his [or her] decision [to hold an accused to answer], may weigh the evidence, resolve conflicts, and give or withhold credence to witnesses, such a balancing of the evidence is not within the powers of a tribunal reviewing the magistrate's order.' [Citation.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. [Citation]. In the light of these rules we examine the issues here raised." (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].)

2. *General law of conspiracy.*

a. *Elements thereof.*

■ Conspiracy to commit an offense consists of the unlawful agreement of two or more persons to commit an offense and an overt act in furtherance thereof. It does not require the actual completion of the substantive offense. (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 47 [139 Cal.Rptr. 275]; § 184.) An overt act need not be criminal in nature, and need not amount to an attempt to commit the offense or to aiding and abetting. (*People* v. *McKinney* (1963) 218 Cal.App.2d 174, 177 [32 Cal.Rptr. 175].)

■ The conspirators must have "the specific intent to (a) agree or conspire and (b) [to] commit the offense that is the object of the conspiracy (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 . . . ; *People* v. *Backus* (1979) 23 Cal.3d 360, 390 . . . .)" *People* v. *Cooks* (1983) 141 Cal.App.3d 224, 311 [190 Cal.Rptr. 211].)

"Criminal liability for conspiracy, separate from and in addition to that imposed for the substantive offense which the conspirators agree to commit, has been justified by a 'group danger' rationale. The division of labor inherent in group association is seen to encourage the selection of more elaborate and ambitious goals and to increase the likelihood that the scheme will be successful. Moreover, the moral support of the group is seen as strengthening the perseverance of each member of the conspiracy, thereby acting to discourage any reevaluation of the decision to commit the offense which a single offender might undertake. And even if a single conspirator reconsiders and contemplates stopping the wheels which have been set in motion to attain the object of the conspiracy, a return to the status quo will be much more difficult since it will entail persuasion of the other conspirators. [Citations.]" (*People* v. *Zamora* (1976) 18 Cal.3d 538, 555-556 [134 Cal.Rptr. 784, 557 P.2d 75].)

### b. *Withdrawal as a defense.*

 " 'Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy. [Citation.] [¶] Although a defendant's arrest and incarceration may terminate his participation in an alleged conspiracy, his arrest does not terminate, or constitute a withdrawal from, the conspiracy as a matter of law. [Citations.] Withdrawal from, or termination of, a conspiracy is a question of fact. [Citation.]' [Citation.]" (*People* v. *Lowery* (1988) 200 Cal.App.3d 1207, 1220 [246 Cal.Rptr. 443]; *People* v. *Cooks, supra,* 141 Cal.App.3d at p. 316; *People* v. *Crosby* (1962) 58 Cal.2d 713, 730-731 [25 Cal.Rptr. 847, 375 P.2d 839].)

Withdrawal from a conspiracy requires "an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the coconspirators. [Citations.]" (*People* v. *Crosby, supra,* 58 Cal.2d at pp. 730-731.)

"A member of a conspiracy may effectively withdraw from it so as to exculpate himself from guilt for the future criminal acts of his coconspirators. [Citations.]" (*Loser* v. *Superior Court* (1947) 78 Cal.App.2d 30, 32 [177 P.2d 320].)

### 3. *Even assuming Sconce withdrew effectively, he remains criminally responsible for the original conspiracy.*

### a. *Summary statement.*

 Under California law withdrawal is a complete defense to conspiracy only if accomplished before the commission of an overt act, or, where it is asserted in conjunction with the running of the statute of limitations.[3]

### b. *The commission of an overt act is the locus poenitentiae in California.*

 "The requirement of an overt act before conspirators can be prosecuted and punished exists, . . . , to provide a *locus p[o]enitentiae*—an opportunity for the conspirators to reconsider, terminate the agreement, and thereby avoid punishment for the conspiracy." (*People* v. *Zamora, supra,* 18

---

[3] Because there is no statute of limitations applicable to the crime of conspiracy to commit murder in California (§§ 799, 805, subd. (a), 182, subd. (a)), Sconce cannot assert the statute of limitations in this instance.

Cal.3d at p. 549, fn. 8; *People v. Crosby, supra,* 58 Cal.2d at p. 728; *People v. Olson* (1965) 232 Cal.App.2d 480, 490 [42 Cal.Rptr. 760].)

Obviously, the inverse of this rule is that once an overt act has been committed in furtherance of the conspiracy the crime of conspiracy has been completed and no subsequent action by the conspirator can change that.

Thus, even if it be assumed Sconce effectively withdrew from the conspiracy or, as Sconce argues, that the People conceded withdrawal before the trial court, withdrawal merely precludes liability for subsequent acts committed by the members of the conspiracy. The withdrawal does not relate back to the criminal formation of the unlawful combination. In sum, conspiracy is complete upon the commission of an overt act.

This rule is consistent with the traditional view that the crime of conspiracy is complete with the agreement and an overt act, and no subsequent action can exonerate the conspirator of that crime. (La Fave & Scott, Substantive Criminal Law (1986) § 6.5(f), p. 110.) Federal law is consonant with this view. "[T]o avoid complicity in the conspiracy, one must withdraw before any overt act is taken in furtherance of the agreement." (*United States v. Monroe* (9th Cir. 1977) 552 F.2d 860, 864; *United States v. Loya* (9th Cir. 1987) 807 F.2d 1483, 1493; *United States v. Read* (7th Cir. 1981) 658 F.2d 1225, 1232-1233.)

■ The rationale in favor of terminating liability is the one relied upon by the trial court, i.e, the reasons for allowing withdrawal as a defense to conspiracy—encouraging abandonment and thereby weakening the group—continue to apply after the commission of an overt act. (*Developments in the Law, Criminal Conspiracy* (1972) 72 Harv.L.Rev. 919, 957, cited by 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 180, p. 200.)

However, the rule remains that withdrawal avoids liability only for the target offense, or for any subsequent act committed by a coconspirator in pursuance of the common plan. "[I]n respect of the conspiracy itself, the individual's change of mind is ineffective; he cannot undo that which he has already done. [Fn. omitted.]" (4 Wharton's Criminal Law, (14th ed. 1981) Conspiracy, § 734, pp. 555-557.)[4]

---

[4] The Model Penal Code recognizes a defense which it refers to as renunciation. The Model Penal Code states: "It is an affirmative defense that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete

Even if this court were inclined to agree with the trial court, we are bound to follow the foregoing settled rule. Any change in the law is a matter for the Legislature.[5]

Because we conclude Sconce's withdrawal from the conspiracy is not a valid defense to the completed crime of conspiracy, we need not determine whether the evidence showed that Sconce, in fact, withdrew from the conspiracy and communicated that withdrawal to each coconspirator. Similarly, Sconce's assertion the People conceded at the trial court level that he had withdrawn is now of no moment.

Nor need we address the People's argument that the public policy in favor of allowing withdrawal from a conspiracy played no part in Sconce's motivation here. The People assert Sconce withdrew either because he realized he no longer could obtain Cindy's life insurance proceeds or because he feared apprehension. Regardless of Sconce's motivation for withdrawing, it cannot insulate him from liability for the conspiracy.

4. *Sconce's claim the evidence did not show the existence of a conspiracy is meritless.*

Sconce argues overt acts must constitute " 'decisive steps' " toward the commission of the crime. He asserts none of the overt acts alleged in the information satisfies this test. He claims the meeting at the Jack-In-The-Box was "mere discussion," the trips to Estephan's home were "mere investigation," and the meetings of Garcia and Dutton "merely . . . expand[ed] the agreement to Dutton." Sconce argues these acts are either the agreement itself, negotiations leading up to the agreement or verbal affirmations of the agreement.

This contention is belied by the record which abundantly satisfies the People's burden of demonstrating a reasonable suspicion a public offense

and voluntary renunciation of his [or her] criminal purpose." (Model Pen. Code, § 5.03, subd. (6).)

The defense of renunciation is not the same as withdrawal. "One difference is immediately apparent: In renunciation, the defendant must 'thwart the success' of the conspiracy. [Citations.] Another important difference is that renunciation is a *complete* defense, relieving liability for all prior involvement in the conspiracy. [Citations.]" (Note, *Withdrawal from Conspiracy: A Constitutional Allocation of Evidentiary Burdens* (1982) 51 Fordham L.Rev. 438, 440, fn. 12.)

Renunciation is not available as a defense in California.

[5] Although it is therefore unnecessary to wrestle with the policy concerns underlying the current rule, we note that avoidance of criminal liability for the target offense and for all future acts of the conspiracy continues to provide incentive for a conspirator to withdraw, assuming the legal fiction the conspirator is knowledgeable in the law of conspiracy.

had been committed. Indeed, the trial court remarked, "No doubt about it, until the time of withdrawal . . . there was a conspiracy."

Sconce also complains the information must fail because he effectively communicated his withdrawal to Garcia who Sconce claims was the sole co-conspirator. He argues Pollerana rejected Sconce's offer, Sallard's involvement was not clearly shown and Dutton had not yet agreed on a price.

These assertions similarly lack factual basis in the record. Although Pollerana refused to kill Estephan, he assisted Garcia with knowledge of Garcia's criminal purpose. Sallard necessarily had to be involved in the plot since he was the link to Cindy, and Dutton clearly agreed to commit the crime. The fact no money had been paid or the existence of conflicting evidence as to the price does not negate Dutton's inclusion in the conspiracy.

## CONCLUSION

Withdrawal from a conspiracy is not a valid defense to the completed crime of conspiracy itself. If this result is seen as anomalous, any change in the applicable law is for the Legislature, not this court.

## DISPOSITION

The order setting the information aside is reversed.

Danielson, J., and Hinz, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 5, 1991.