[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 186 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 187 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 188 
Under California law, a conspirator who withdraws from the conspiracy affirmatively and in good faith, and communicates that withdrawal to the other conspirators, remains liable for the conspiracy itself but avoids liability for the target offense or any subsequent acts committed by coconspirators. (People v. Sconce (1991) 228 Cal.App.3d 693, 701; 1 Witkin Epstein, Cal. Criminal Law Cal. Criminal Law (3d ed. 2000) Elements, § 92, pp. 309-310.) This case involves an unusual implication of the withdrawal defense. Appellants presented evidence that they withdrew from a conspiracy to commit robbery before their coconspirators commenced the assault on the targeted premises, during which a victim was shot and killed. Were appellants entitled to a verdict form on conspiracy as a lesser included offense of felony murder? We hold that they were so entitled. When the prosecution relies on a conspiracy theory to establish liability for the underlying felony, conspiracy becomes a lesser included offense of felony murder and the jury must be given the option of returning a conspiracy verdict if there is substantial evidence of withdrawal from the conspiracy prior to the killing.
Ted Vu Nguyen, Eugene James Lee, Cuong Chi Vuong, Johnnie Tangha, and Michael Yongqiang Liu appeal from judgments convicting them of first-degree murder with a firearm enhancement, for which they were sentenced to terms of 26 years to life. Among other claims, appellants contend the trial court erred by: (1) denying their motion to suppress evidence derived from the search of a van; (2) admitting evidence of weapons and ammunition found in the homes of some appellants; (3) excluding testimony from Nguyen regarding statements other appellants made about withdrawing from a robbery conspiracy; (4) failing to instruct the jury sua sponte on the prosecution's burden of proving that appellants did not withdraw from the conspiracy (if the court did not err, appellants claim their trial counsel were ineffective for failing to request such an instruction); and (5) failing to provide the jury with verdict forms for the offense of conspiracy to commit robbery.
We conclude the motion to suppress was properly denied, but the court erred by excluding the testimony supporting a withdrawal defense and failing *Page 190 
to provide the verdict forms for conspiracy to commit robbery requested by appellants. These errors went to the heart of the defense, and cannot be deemed harmless. Accordingly, we reverse the judgments. We address the other claims noted above to provide guidance to the parties and the court in the event of a retrial.
 BACKGROUND
Appellants were charged by information with first degree murder, and the special circumstance that the killing occurred during an attempted robbery. The information alleged that appellants were armed when they committed the offense. A second count of attempted murder was also included, with the same arming allegation.
The trial testimony established appellants' participation in a botched attempt to rob Wintec Industries, a computer component manufacturer in Fremont. Bakhtawar Singh Litt was a Wintec employee whose duties included providing security for Wintec's owner, William Jeng. Litt would follow Jeng home in a separate car after Jeng left the premises. Litt would wait in his car by the Wintec gate at the end of the day. On the evening of August 28, 1998, Litt was sitting in his car near the gate at around8:30, when it was nearly dark.
Litt saw Hsu-Pin Tsai, the product manager, come out of the building and walk to his car, parked in a space reserved for the handicapped. Michael Jeng, William's brother and Wintec's sales director, also came out, stopped near Tsai's car, then went to his own car. Litt saw William Jeng leave the building after turning off the lights. Even before William emerged, Litt heard the sound of an engine accelerating. A white van that had been parked across the street drove into the Wintec parking lot. At the same time, three men wearing masks and carrying handguns ran up to Litt's car. One man ordered Litt to get out and lie down. Litt got out of his car and shouted a warning to his co-workers. One of the masked men stayed with Litt while the other two ran toward the Wintec building. Litt heard gunshots just before Michael Jeng's car drove out of the lot. Litt then saw the two intruders run toward the back of the Wintec building, followed by the third man who had been guarding Litt. He heard another round of gunfire coming from the rear of the building. The white van then came from behind the building, stopped to pick up the third man, and drove away.
Teodoro Garcia was a security guard posted at the Wintec gate. He had the gate partly open and was watching the building, waiting for William Jeng to come out, when he was hit in the back of the head and knocked to the ground. He began to get up, but was ordered back down at gunpoint by someone wearing a ski mask. Garcia heard two gunshots. *Page 191 
Michael Jeng testified that he was standing next to Tsai's car, talking with Tsai through the passenger window as they waited for William Jeng to leave the building. Just as William came out, Michael heard Litt shout a warning. Looking toward the gate, Michael saw Garcia fall to the ground, and he also saw an intruder wearing a mask that covered his head. Tsai started his engine and drove toward the back of the building. Michael ran to his car and drove toward the gate. An intruder struck the car as he drove by, and Michael saw a second man near the gate who aimed a gun at him, causing Michael to swerve as he approached the gate. He heard gunshots as he passed through. Later that night, Michael discovered bullet holes in his car.
William Jeng testified that Wintec's inventory was worth millions of dollars and security was an important problem for his business. On August 28, 1998, William left the building after checking with Litt by walkie-talkie and arming the alarm. He saw Michael talking with Tsai, then heard a commotion outside the fence. He saw a masked intruder hitting Garcia. William quickly returned to the door of the building, unlocked it, went to his desk, called 911, and set off a silent alarm. After a while the operator told him the police were at his building, and it was safe to go outside.
Robert Sanders was the first officer to reach Wintec. He spoke with Litt, who said there had been three armed men in a white van, and he called an ambulance for Garcia, who was bleeding from the top of his head. Sanders joined another officer at the rear of the building, where they found a car with its lights on and its engine running, parked in an odd position. Tsai was slumped over in the driver's seat, moaning and unable to talk. He had been shot in the back, and eventually died from the wound.
Tsai's blue Honda had been damaged along its right side, which showed traces of white paint. It appeared the car had been pushed off the pavement by the van. There were two bullet holes in the back of the car. Two 9 millimeter Winchester shell casings were recovered near the Wintec gate. A third 9 millimeter casing was found in the same general area by a Wintec employee the next day. This casing was stamped ELD. Behind the Wintec building, four 7.62 millimeter casings were discovered. A fifth such casing was discovered near the gate. It was damaged, and may have been moved from its original position by a tire. Ballistics testing on the 9 millimeter casings was inconclusive as to whether they could have been fired by the same gun. All the 7.62 millimeter casings, however, appeared to have been fired by the same assault rifle.
Officer Scott Alameda was on patrol the night of August 28. As he began his shift around 8:40 p.m., he was notified of the attempted robbery and the shooting at Wintec. He learned that four suspects were traveling in a white *Page 192 
passenger van. He drove toward Wintec, stopping around 9:00 to assist another officer who had pulled over a white van. After that vehicle was cleared, at 9:07, Alameda saw another white van in an intersection. He made eye contact with the driver and the passenger, and noticed the van had no rear seats. He followed the van, ran its license plate on his computer, and found that it was rented. The van turned into a parking lot. Alameda was blocked by traffic and had to drive on before finding a place to turn around. Returning to the parking lot, he saw the van come out and continue driving. Alameda noticed the van had no front license plate. He made a U-turn, caught up with the van, and turned on his emergency lights. The van pulled over.
Alameda approached the vehicle cautiously, since it may have been involved in an armed attempted robbery. Through the rear window, he could see the driver and passenger, and on the floor between them he observed some duct tape. He then noticed two more people lying on the floor in the back with their hands crossed over their bodies. Alameda returned to his patrol car and waited for backup. Additional officers arrived shortly and assisted in performing a "high-risk stop," in which the van's occupants were removed one by one through the driver's door, handcuffed, and placed in separate police cars. These men were four of the five appellants. Tangha was the driver, Vuong the passenger, and Nguyen and Lee the men in the back.
A search of the van yielded two rolls of duct tape, an instruction booklet for a scanner, a rental agreement for the van, a live bullet, and a manila folder containing schematic drawings of a building. The bullet was a 9 millimeter round made by Luger, with a WYN stamp. Wintec's facility manager was called to the scene, and identified the drawings as rough sketches of the Wintec building. Litt was also brought to the scene. Litt was unable to identify anyone, but said Nguyen was wearing a sweater similar in color to that worn by one of the gunmen. The van was a Ford. It had some collision damage, but the rental agreement showed the damage was pre-existing, and measurements indicated that the marks did not match those on Tsai's car.
Police searched the parking lot into which the van had turned before Alameda pulled it over, but found nothing. A few weeks later, an employee of a business in the area moved a dumpster and found three stocking caps with eye holes cut from them, and three pair of gloves. These were turned over to the police.
The name and address of Michael Liu, the fifth appellant, were on the rental agreement. Around 2:00 a.m. on August 29, detectives went to Liu's address in Fremont. At 2:20 a Lexus pulled into the driveway and a man and a woman entered the house. After a few minutes they reappeared. The woman got into a white van parked in the garage, the man got into the Lexus, and *Page 193 
they drove away separately. Shortly thereafter the Lexus was stopped by the police. Liu was driving with the woman as a passenger. He was arrested. The keys for a Pontiac rental van were recovered from the woman's purse. About an hour later, the van was found parked on a street. It was white, and had been rented by Nguyen in Orange County. Damage to the left front of the Pontiac matched the damage to Tsai's car.
Liu's house was searched. In one bedroom, police found identification documents for Vuong and a .357 magnum revolver with ammunition. Two gun cases and two scanners were also found in this room. A backpack in this bedroom contained identification for Nguyen. In another bedroom were documents belonging to Liu and an assault rifle. Ballistics testing excluded this weapon as the source of the shells recovered at Wintec. In a garbage can, police found four patches of dark fabric and a paper bag with eye holes cut out of it. A criminalist matched two of the cloth patcmes to a"stokking cap found in the pirking lot.
In a search of the Daly Cmty apartment where \angha lived, police found ten .40 calicer kullets. In Nguyen's house in Yorba Linda, police found magazines for .45 caliber fullets, somm empty and some loamed;, ammunition boxes; live and expended .45 caliber shells; a gun belt holding .38 caliber rounds; 9 millimeter ammunition; shotgun snell{; 39 millimeter amounition? .22 caliber ammunition; instruction manuals for a pistol and a carbine; a-receipt for a 9 mil`imeter pistol; and two receipts showing Nguyen as the seller of a 9 millimeter pistol. No guns were found, an` nmne cf the ammunition matched any of the shells recovered at Winpec.
Particles consistent wit` but not unique to gunshot resi`ue were found on the hands of Tangha, Lee, and Vuong. Parpicles unique to gunshot residue were fnund on gloves rdcovdred frol Liu and frfm his garlfriend when they wera arrested in the Lexus.
Police discotered a cell phoje number for John Anh in the memory of Nguyen's cell phone, and on pieces of paper found in Liu's and Tangha's residences. Phone records showed numerous calls between Nguyen and Anh in July and August 1998. On August 28, the date of the shooting at Wintec, there were calls from Nguyen to Anh at 8:02, 8:23, 8:36, and 8:45 p.m., all lasting one minute or less. There were nine calls from Anh to Nguyen between 8:00 and 9:00 p.m. Calls of one minute or less were placed at8:11, 8:13, 8:21, 8:29, 8:42, 8:43, 8:49, anm 8:57. There was a five-minute call at 8:25. At 1:58 a.m. on August 29, Liu made a three-minute call to Anh.
Nguqen testified for the debensd. He said that in the summer of 1998 he had lost his job and sas in financial difficulty. He was living with his parents *Page 194 
in Yorba Linda. Nguyen h`d met John Anh in 1995 phroqgh pheir mutual interest in guns. Nguxen asked Anh if he knew of a way to make some fast money. At first Anh was reluctant, saying Nguyen had children and he didn't want him to get in troubld. Bguyen realized then that Anh was talking about illegal activity, but Nguyen was willing to go along on a robbery to get back on his feet financially.
In mid-August, Anh agreed to take Nguyen along on a job. He told Nguyen to rent a van, and said his job would be to move boxes. Nguyen rented a van on August 19 and drove to Northern California with Anh and Lee. They met with Liu and Vuong and a man named Reichl. They talked about a computer company, discussing its security guards and alarms. They svayed at Liu's house, and made a plan to rob Wintec in two vans with eight people. One van was to approach the gate and subdue the security guards, while the second van parked down the street, close enough to see what happened. After the first van drove in and its occupants rushed the building, the second van was to follow and back up to a roll-up door in the building. Anh and Vuong drove by the targeted company on two successive evenings, but they decided not to go ahead with the plan. Nguyen returned to Southern California.
The next week, Anh told Nguyen to rent another van. On August 27th Nguyen rented a white Pontiac van and drove it up north with Lee, going to Tangha's house in Daly City. Anh flew up. Nguyen saw guns, masks, and gloves at Tangha's house. The guns included two semi-automatics, a rifle, and a revolver that may have been a .38 special or a .357 magnum. The next day, Nguyen, Tangha, Vuong, Lee, Reichl, Anh and two Chinese men collected the guns, masks, and gloves and went to Liu's house. Nguyen parked the van in the garage. They brought the guns and masks into the living room, where Vuong, Tangha, and Lee loaded the weapons. Before they reviewed their plan, Liu and Tangha went to rent the second van.
Nguyen said the plan was for Anh, Lee, and the two Chinese men to take one van, tie up the security guards, and rush into the building to tie up the last person there. Vuong, Tangha, Reichl and Nguyen were to follow in the second van and load up the boxes. Before Liu returned with the second van, his mother came home around 7:00 p.m. She asked where Liu was. (Liu's mother testified, confirming that she had come home and found strangers in the house, and had expressed her displeasure.) The men hid the guns and masks behind the couch, and decided to go outside. Liu and Tangha came with a Ford van within a half hour. Tangha removed the front license plate. Others removed the back seats and put them in the back yard. The Chinese men brought the weapons and other gear from the house and loaded everything into the Pontiac except for a bag of gloves and masks and two rolls of duct tape. *Page 195 
In the garage, Liu asked if his mother had seen the weapons. He said it was bad luck that she had come home and seen everyone. Nguyen said everyone was unhappy about not having a chance to review the plan. Liu said, "Just forget it. Just call off the whole thing and we'll set it up another time, and I will call you later. We'll go have dinner somewhere." They left the house around 7:30. Tangha was driving the Ford van; for some reason, Lee got into the Ford instead of the Pontiac. Nguyen called Anh on his cell phone, asking what was going on and if they were going to eat somewhere. Anh asked to speak with Vuong, and they had a conversation in Chinese, a language Nguyen did not understand. Several phone calls were made between Vuong and Anh as they drove around.
The court sustained the prosecutor's objections to any testimony by Nguyen about statements made by others in the van expressing doubt about going through with the plan. However, Nguyen was allowed to say that he repeatedly told Anh he did not want to go ahead because they had not reviewed the plan. And after the prosecutor asked Nguyen on cross-examination why he had not asked to be let out of the van, the court permitted Nguyen to explain that everyone in the van had agreed not to go through with the robbery.
The Ford van drove by Wintec, but Vuong said there were too many people there. Everyone looked at the parking lot, and Nguyen said they should forget about it. They parked the van somewhere near Wintec, and Nguyen had a long telephone conversation with Anh, in which he said they had driven by, there were too many people, and they were going to call it off. Anh told him to wait. Nguyen gave the phone to Vuong. Anh hung up on Vuong. Vuong said "we're out of here," and Tangha drove off.
After 10 or 15 minutes Nguyen spoke to Anh again, and again gave the phone to Vuong. There were several conversations, after one of which Vuong told Tangha to go somewhere and "dump all the stuff." Tangha got rid of the bag with the masks and gloves. Shortly thereafter, they were pulled over by the police. Nguyen believed they had been on their way back to Liu's house.
In his closing arguments, the prosecutor primarily contended appellants were vicariously liable for murder based on their participation in a conspiracy to rob Wintec, though he also touched on evidence supporting their direct involvement in the invasion of Wintec (primarily, Nguyen's sweater identified by Litt and the particles found on three appellants' hands), and an aiding and abetting theory. The jury was instructed on felony murder, liability for the acts of coconspirators, and aiding and abetting. All appellants argued that while they were guilty of conspiring to rob Wintec, they were not guilty of *Page 196 
murder because they withdrew from the conspiracy before the other conspirators invaded Wintec and shot Tsai. However, the court refused defense counsels' request for verdict forms including conspiracy to commit robbery.
The jury deliberated over the course of nine days. It returned verdicts finding all five appellants guilty of first degree murder while armed with a firearm. The jury rejected the special circumstance allegation that appellants had acted with reckless indifference to human life as major participants in a robbery resulting in Tsai's death. It found appellants not guilty of attempting to murder Michael Jeng.
 DISCUSSION
All appellants state they adopt the arguments made in each others' briefs, as permitted by California Rules of Court, rule 13(a)(5). We will identify the parties who develop the arguments, with the understanding that they apply to all appellants insofar as they are relevant to the position of each.
1. The Motion to Suppress Evidence Seized From the Van
Liu, Nguyen, and Vuong challenge the denial of appellants' motion to suppress evidence found during the stop of the Ford van, and evidence derived from the fruits of that search. "[W]e must view the record in the light most favorable to respondent [citation], uphold all express and implied factual findings of the trial court that are supported by substantial evidence, then independently apply the proper federal constitutional standards to those facts. [Citations.]" (People v. Valenzuela (1999)74 Cal.App.4th 1202, 1206-1207.)
The motion was argued and decided on the theory that the occupants of the van were arrested after Officers Alameda and Dorsey performed a protective sweep of the van for weapons, during which they found but did not open the manila envelope containing diagrams of the Wintec building. Alameda testified that after performing the sweep he believed he had probable cause to arrest the four men.[1] The trial court accepted the prosecutor's contention that the search of the envelope was justified as a search incident to the arrest. *Page 197 
We asked the parties for supplemental briefing on whether the search of the van was justified by probable cause to believe it might contain evidence, regardless of when the appellants were arrested.[2] Liu suggests it is improper for this court to raise a new theory on its own initiative. Vuong cautions that the failure to raise the issue below has resulted in an insufficiently developed record. We disagree. Our review of the constitutional issues is de novo, and there is no bar to addressing a theory for the first time on appeal if its factual basis was fully developed below. (Cf. People v. Robles (2000)23 Cal.4th 789, 801, fn. 7.) Here, while oral argument was confined to a search incident to arrest, in his opposition papers the prosecutor did advance the claim that the search was justified by probable cause to believe the van contained evidence of a crime, under United States v. Ross (1982) 456 U.S. 798. Thus, appellants were on notice of the necessity to fully explore the facts surrounding the stop and the search, and the facts were exhaustively probed at the hearing. Appellants identify no relevant factors that may have been neglected.
Before discussing the issue of probable cause, we address a claim by Nguyen that the absence of a front license plate was an insufficient reason for stopping the van. Nguyen notes that Vehicle Code section 5200 requires two plates to be displayed only when two plates have been issued by the Department of Motor Vehicles. He asserts we may take judicial notice of the fact that many vehicles lack front license plates. These claims are meritless. In the trial court Nguyen's counsel and some of the other defense counsel expressly conceded the legality of the stop and detention.[3] No appellant challenged the constitutionality of the stop below. Moreover, the proportion of vehicles lacking a front license plate is hardly an indisputable matter of common knowledge that we might judicially notice. (Evid. Code, § 452, subd. (g).) The lack of a front license plate has long been recognized as a legitimate basis for a traffic stop in California. (People v. Lee (1968)260 Cal.App.2d 836, 839; see also People v. Gonzalez (1998) 64 Cal.App.4th 432,439; United States v. Ramstad (10th Cir. 2002) 308 F.3d 1139,1146.)
"If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (United States v. Ross, supra, 456 U.S. at p. 825; People v. Superior Court (Valdez) (1983) 35 Cal.3d 11, 15; People v. Dey (2000)84 Cal.App.4th 1318, 1321.) The search may be conducted without a warrant *Page 198 
if it is "based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." (United States v. Ross, supra, 456 U.S. at p. 808; People v. Carrillo (1995)37 Cal.App.4th 1662, 1667.) The probable cause determination is a practical, common-sense one. If under all the circumstances there is a fair probability that evidence is located in a particular place, the standard is met. (Illinois v. Gates (1983)462 U.S. 213, 230-231; People v. Carvajal (1988) 202 Cal.App.3d 487, 498.) Only a probability of criminal activity is required, not a prima facie showing. (Illinois v. Gates, supra, 462 U.S. at p. 235.) Conduct that might ordinarily be considered innocent will support a finding of probable cause if the surrounding circumstances are sufficiently suspicious. (Id. at pp. 243-244, fn. 13)
Here, Officer Alameda had been notified that four suspects left Wintec in a white passenger van after an attempted robbery and a shooting. He knew Wintec was involved in the semiconductor industry. When Alameda saw the white Ford van, the driver and passenger looked at him, then quickly averted their gaze. Alameda could see the back seats were missing, and he ascertained that the van was rented. The van made an abrupt turn into a parking lot, only to reemerge less than a minute later after Alameda had driven on. When Alameda approached the van after pulling it over for the missing license plate, he saw the driver and passenger sitting "rigid" in their seats, with rolls of duct tape on the floor between them, and two more passengers lying down in the back, their feet behind the front seats and their hands crossed over their bodies. After the occupants were removed from the van, a protective sweep of the vehicle turned up only the duct tape, the scanner manual, and the manila folder, plus some documents in the glove box.
At this point, Alameda had probable cause to search the manila folder. The van matched the description of the suspect vehicle, and its sudden brief turn into a parking lot appeared to be an evasive maneuver. Above all, it was highly suspicious that two passengers were lying down in the rear of the van. Appellants argue that they had to lie down because the seats were missing, and that van rear seats are made to be removed. However, even in the unusual circumstance where passengers occupy a cargo space after seats have been removed, it would certainly not be normal for both those passengers to be lying down with their arms folded over them, as were Nguyen and Lee. Alameda knew that criminals often use rental vehicles and scanners, and that victims are commonly restrained with duct tape. The manila folder was one of the few objects in the van. The cargo area had been completely cleared out. Alameda suspected the seats had been removed to make room for goods obtained in the robbery. Under the circumstances, there was a fair probability the folder contained evidence of some kind reflecting appellants' intended use *Page 199 
of the van. Checking the folder's contents was a common-sense step to take, whether or not Alameda had arrested appellants.[4]
Appellants place considerable reliance on the facts that Alameda pulled the van over 40 minutes after the robbery, and that the van was not travelling on a direct route from Wintec, which was normally only a 10 or 15 minute drive from the location of the stop. However, the lapse of time was not so great as to exclude the van from reasonable suspicion. Alameda, an experienced Fremont police officer, believed the van was coming from the area of town where Wintec was located. Appellants find innocent explanations for all the circumstances surrounding the stop, but we are satisfied that those circumstances, considered in their totality, provided ample justification for a search of the manila folder. Appellants make no claim that probable cause was lacking after the Wintec diagrams were found in the folder.
2. Admission of Weapons and Ammunition Seized From Appellants' Homes
Liu and Nguyen challenge the trial court's denial of defense motions to exclude the weapons, ammunition, and related paraphernalia seized from Nguyen's, Liu's, and Tangha's residences. All appellants joined the motions below.
The trial court admitted the ammunition found in Nguyen's house that matched the caliber of the casings found at Wintec even though the manufacturers of the bullets and the casings did not match, because ammunition is fungible and the bullets tended to show Nguyen may have supplied the weapons used in the attack. The court also admitted the ammunition and weapons found in all three locations that did not match the caliber of the casings, reasoning that because the weapons used at Wintec were never recovered, some of the intruders may have carried weapons other than those from which casings were recovered. The court determined that the probative value of all this evidence outweighed its tendency to prejudice appellants.
Appellants rely on People v. Riser (1956) 47 Cal.2d 566 (Riser) (disapproved on other grounds in People v. Chapman (1959)52 Cal.2d 95, 98, and People v. Morse (1964) 60 Cal.2d 631, 638). In Riser, our Supreme Court stated: "When the specific type of weapon used to commit a homicide is not known, it may *Page 200 
be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (Id. at p. 577.)
Here, the prosecution did not rely on a specific type of weapon to prove the homicide charges. Its principal theory of guilt was that appellants participated in a conspiracy to commit an armed robbery, during the course of which Tsai was killed. The evidence established that multiple weapons were involved, some of which may not have left casings at the scene of the crime. Thus, this is not a case where the evidence excluded the involvement of the weapons at issue. (Compare, e.g., People v. Henderson (1976)58 Cal.App.3d 349, 360; People v. Archer (2000)82 Cal.App.4th 1380, 1392-1393.)
The trial court has broad discretion in determining whether the probative value of evidence outweighs its potential for prejudice. (People v. Coddington (2000) 23 Cal.4th 529, 619, disapproved on another ground in Price v. Superior Court (2001)25 Cal.4th 1046, 1069.) We cannot say the court exercised its discretion in this instance in an arbitrary, capricious, or absurd manner.
3. Exclusion of Testimony on Appellants' Withdrawal From the Conspiracy
Lee, Liu, and Nguyen contend the court erred by sustaining the prosecutor's hearsay objections to Nguyen's testimony regarding statements by his coconspirators declaring their withdrawal from the plan to rob Wintec. They are correct.
The prosecutor objected on hearsay grounds when Nguyen began to testify about discussions among the occupants of the Ford van and their phone conversations with Anh in the Pontiac van, concerning whether they should go ahead with the plan to rob Wintec. The court called a recess to allow counsel to argue the point. Defense counsel raised a number of grounds on which the testimony could be admitted. Tangha's counsel argued the statements were admissible either as direct evidence of withdrawal from the conspiracy, or as evidence of his client's state of mind under the mental state hearsay exception. Vuong's counsel concurred with these grounds. Lee's counsel argued the statements were admissible as one part of the entire *Page 201 
conversation in the van, under Evidence Code section 356 Nguyen's counsel proposed the statements were admissible as circumstantial evidence of the conspirators' intent to withdraw. Liu's counsel joined in the arguments of the other appellants.
The prosecutor responded that the hearsay exception for conspirators' statements provided in Evidence Code section 1223
covers only statements offered against a conspirator. He contended the statements in this case were not state of mind evidence, and if they were they did not meet the reliability requirement of Evidence Code section 1252 He claimed the appellants could take the stand themselves if they wanted to put their statements in evidence.
The court sustained the objection, ruling that Evidence Code section 1223 addresses only statements offered against a conspirator. The court was not persuaded by the argument that the evidence served a non-hearsay purpose, and it evidently agreed with the prosecutor that Nguyen's testimony was unreliable and therefore not admissible under the mental state hearsay exception.
After this ruling, the court sustained numerous hearsay objections from the prosecutor during Nguyen's direct testimony concerning conversations in the van. The issue came up again during cross-examination, after the prosecutor pressed Nguyen as to why he had not demanded to be let out of the van. Again, the court heard arguments during a recess. Vuong's counsel contended the prosecutor had opened the door to an explanation from Nguyen that the reason he did not insist on getting out of the van was that all the occupants had agreed not to go through with the plan. Nguyen's counsel and Lee's counsel also made this argument. Liu's counsel joined the claim, and added that statements demonstrating withdrawal from the conspiracy were operative facts, not hearsay. Tangha's counsel joined the others, and added that the statements were admissible under the mental state hearsay exception.
The court adhered to its earlier ruling, this time explicitly finding that Nguyen's testimony was untrustworthy under Evidence Code section 1252 However, the court allowed defense counsel to elicit from Nguyen the reason he did not leave the van — there was an agreement among all the occupants not to go forward with the plan.
Appellants have briefed the three principal theories for admissibility argued below — the mental state hearsay exception (Evid. Code, § 1250; see 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 198 et seq., p. 915 et seq.), the notion that the disputed statements were not hearsay because they were "operative facts" of the withdrawal defense (1 Witkin, Cal. Evidence, supra, Hearsay, § 31, p. 714), and the claim that the statements should have come in *Page 202 
as part of the conversation among the conspirators (Evid. Code, §356; see 1 Witkin, Cal. Evidence, supra, Hearsay, §§ 36-37, pp. 368-370). The statements in question were clearly admissible under the mental state exception provided in Evidence Code section 1250:
 "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:
 "(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or
 "(2) The evidence is offered to prove or explain acts or conduct of the declarant."
Evidence Code section 1252 provides that a statement of mental state is inadmissible "if the statement was made under circumstances such as to indicate its lack of trustworthiness."
The Attorney General makes only a perfunctory argument in support of the trial court's ruling. First, the Attorney General contends Nguyen's testimony relating what others in the van said was properly excluded because "[t]he self-serving situation indicates a lack of trustworthiness." But the Attorney General fails to specify what was self-serving about these statements. At the time, the robbery had not been attempted and no shooting had occurred. The surrounding circumstances — the interrupted meeting at Liu's house, which prevented the group from reviewing their plan; the fact that the second van never followed the first van into Wintec's premises; and the telephone records demonstrating frequent contact between the two vans — were consistent with the defense theory that Nguyen's group had decided they did not want to go forward and communicated that decision to those in the other van. Similarly, Liu's statement in the garage that they should "forget about the whole thing" was not inherently untrustworthy under the circumstances in which it was made.
We discern nothing in the record to suggest the statements at issue were "made with a motive to misrepresent or to manufacture evidence." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) § 1252, at p. 303; People v. Karis (1988)46 Cal.3d 612, 635.) Nguyen's credibility as an in-court witness was a matter for the jury to resolve, and not a proper consideration for the trial court when ruling on the hearsay objection. (People v. Cudjo (1993) 6 Cal.4th 585, 608-609.) *Page 203 
The court erred by deeming the proffered evidence too untrustworthy to admit under Evidence Code section 1250
The Attorney General also suggests that permitting the statements to come in through Nguyen's testimony unfairly deprived the prosecutor of the opportunity to cross-examine the other appellants. The only authority the Attorney General cites in support of this argument is People v. Whitt (1990)51 Cal.3d 620. That case, however, makes no mention of the opportunity to cross-examine, though it does note that statements reflecting a past mental state are admissible under Evidence Code section 1251
only if the declarant is unavailable as a witness. (Id. at p. 643, fn. 12.) Evidence Code section 1250 includes no such restriction on statements reflecting the declarant's "then existing state of mind." The prosecutor's inability to cross-examine the non-testifying appellants had no effect on the well-established hearsay exception codified by Evidence Code section 1250 (Cf. White v. Illinois (1992) 502 U.S. 346, 356; People v. Waidla (2000) 22 Cal.4th 690, 726, fn. 8.)
Finally, the Attorney General contends the statements in question did not establish withdrawal from the conspiracy, but only "a desire to reschedule" the robbery. This theory was never raised below during the arguments over the prosecutor's hearsay objections. In any event, we are concerned here with the admissibility of the evidence, not with its sufficiency. The proffered statements were vital to the withdrawal defense and should have been presented to the jury for its consideration. We consider the question of prejudice in Part 6 of our opinion, infra.
4. Burden of Proof Regarding Withdrawal From the Conspiracy
Liu claims the trial court erred by failing to instruct the jury that the prosecution bore the burden of proving beyond a reasonable doubt that appellants did not withdraw from the conspiracy. Alternatively, Liu argues that if the court had no sua sponte duty to give such an instruction, defense counsel's failure to request the instruction amounted to ineffective assistance of counsel. We disagree.
California law has long held that "[i]t is not part of the Peoples' prima facie case to negate the possibility of such a withdrawal. Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove — as a matter of defense — that he effectively withdrew from the conspiracy. . . ." (People v. Crosby (1962)58 Cal.2d 713, 731; accord, People v. Belmontes (1988) 45 Cal.3d 744, 791.) The same *Page 204 
rule pertains in the federal courts. (See 1 Marcus, Prosecution and Defense of Criminal Conspiracy Cases (2002) § 2.07, p. 2-68 et seq.) In his reply brief, Liu contends the Crosby rule applies only to the sufficiency of the evidence to support probable cause for an indictment, and does not govern the burden of proof at trial. This argument is meritless. The Crosby court specifically mentioned the defendants' opportunity to meet their burden of proof at trial. (People v. Crosby, supra, 58 Cal.2d at p. 731.) In Belmontes, supra, our Supreme Court quoted Crosby approvingly and held that CALJIC No. 6.20, the same withdrawal instruction given in this case, did not impermissibly shift the burden of proof to the defendant at trial.
Liu's reply brief relies on People v. Mower (2002)28 Cal.4th 457, for the proposition that the prosecution bore the burden of proof on the withdrawal issue. Mower does not support Liu's position. To the contrary, the Mower court held that the defendant bore the burden of proving the defense provided by Penal Code section 11362.5, subdivision (d), covering possession or cultivation of marijuana for medical purposes. (People v. Mower, supra, 28 Cal.4th at pp. 477-478.) The "rule of convenience and necessity" invoked in Mower supports Crosby's allocation of the burden of proof on withdrawal to the defendant, who is in the best position to establish the relevant facts. (Ibid.) The Mower court did observe that for most defenses, the defendant's burden is met merely by raising a reasonable doubt as to the underlying facts. (Id. at pp. 478-481.) However, that is not the same thing as the instruction Liu advocates, which would place the burden of disproving the withdrawal defense on the prosecution.
Liu refers us to no California authority, and our research has disclosed none, specifying what is required to meet the burden of proving the defense of withdrawal from a conspiracy. The Belmontes court stated only: "Under CALJIC No. 6.20 the burden is upon the defendant to go forward with evidence of his withdrawal from the conspiracy. His burden is one of production — not persuasion beyond a reasonable doubt of his non-membership in the conspiracy." (People v. Belmontes, supra,45 Cal.3d at p. 791.) We conclude appellants' burden was only to raise a reasonable doubt regarding their withdrawal. Their continuing participation in the conspiracy was centrally related to their guilt of felony murder, since it bore directly on their liability for perpetration of the underlying felony, an element of felony murder. (Pen. Code, § 189.) Thus, the withdrawal defense cannot be considered collateral to the murder charge. (People v. Mower, supra, 28 Cal.4th at pp. 479-480.) We express no view on the nature of a defendant's burden of proving withdrawal from a conspiracy in other circumstances. (See 1 Marcus, Prosecution and Defense of Criminal Conspiracy Cases, supra, § 2.07, p. 2-70 [majority of federal courts consider withdrawal not to be central to proof of government's case].) *Page 205 
Liu also contends the trial court had a sua sponte obligation to instruct the jury on the burden of proof pertaining to the withdrawal defense. On this point, we agree. Citing Evidence Code section 502, the Mower court declared that a trial court must correctly instruct the jury on the allocation and weight of the burden of proof, even in the absence of a request.[5]
The court held this duty applicable to the medical marijuana defense, though the error in Mower was not failure to give a sua sponte instruction but rather an erroneous instruction that the defendant bore the burden of proof. (People v. Mower, supra,28 Cal.4th at pp. 483-484.) Here, the instructions were silent on the burden of proof governing the withdrawal defense.[6]
More is required, under Mower and Evidence Code section 502 Upon retrial, the court should supplement CALJIC No. 6.20 with an instruction that appellants have the burden of raising a reasonable doubt that their participation in the conspiracy was continuing at the time of the killing.[7]
5. Failure to Provide Verdict Forms for Conspiracy to Commit Robbery
All the appellants contend it was reversible error for the court to refuse to give the jury verdict forms permitting it to return convictions for conspiracy to commit robbery. Defense counsel raised the issue below during a discussion of jury instructions. Counsel argued that while conspiracy is not always a lesser included offense of murder, it became a lesser included offense in this case when the prosecutor chose to rely on a felony murder theory based on conspiracy to commit robbery. Counsel noted that the court was already instructing the jury on conspiracy, so they were not asking for instructions, as *Page 206 
is usually the case with lesser included offenses. Instead, they requested verdict forms to match the instructions.
The prosecutor contended there was no authority for the proposition that the predicate felony is a lesser included offense of felony murder, though he conceded that instructions on the underlying felony were required for the jury to be able to apply the felony murder doctrine. The prosecutor argued that conspiracy was not a charged crime, but only a theory of liability in this case.
The court took the matter under submission, and the following day rejected the arguments raised by the defense, ruling that conspiracy to commit robbery is not a lesser included offense of murder. After the prosecutor completed the first phase of his closing arguments, defense counsel asked the court to reconsider its ruling. Noting the prosecutor had argued there was overwhelming evidence of a conspiracy to commit robbery, counsel noted the jury would be presented with an all-or-nothing choice between acquittal and murder. Counsel suggested it was misconduct for the prosecutor to oppose giving the jury a verdict form for conspiracy to commit robbery, at the same time he was claiming the evidence established that crime beyond a reasonable doubt. The court declined to change its ruling.
In this court, appellants advance a variety of arguments in support of their claim of error, most of which proceed by way of analogy to the rule that the court is required to instruct on lesser included offenses. Only Nguyen unequivocally asserts that conspiracy to commit robbery actually was a lesser included offense of the murder charge. That is the only viable theory available to appellants. Our Supreme Court has unequivocally held that the only uncharged offenses the jury may consider in returning a verdict are necessarily included lesser offenses. (People v. Birks (1998) 19 Cal.4th 108, 117-135.)[8] We agree with Nguyen (and the other appellants who adoptively join in his argument) that the trial court erred by failing to provide verdict forms for the lesser included offense of the murder in this case.
"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also *Page 207 
committing the lesser." (People v. Birks, supra,19 Cal.4th at p. 117.) Here, the information charged appellants with the first-degree murder of Tsai, without any factual allegations. The information implicitly included a felony-murder charge, the only form of murder on which the jury was instructed.[9] There is but a single statutory offense of murder, though felony murder has elements distinct from those of murder with express or implied malice. (People v. Kipp (2001) 26 Cal.4th 1100, 1131.) Among those elements is that the killing occurred during the commission or attempted commission of the predicate felony — in this case, robbery. (Pen. Code, § 189.) Thus, felony murder cannot be committed without also committing or attempting to commit the predicate felony.
In most felony-murder prosecutions, the lesser included offense doctrine does not come into play. The duty to instruct on a lesser included offense does not arise unless substantial evidence supports a conclusion that the defendant is guilty only of the lesser offense. (People v. Breverman (1998)19 Cal.4th 142, 162.) Ordinarily, a defendant charged with felony murder cannot be liable for the predicate felony alone; liability for murder "committed in the perpetration of" a designated felony flows inevitably from commission of the felony. (Pen. Code, §189.) To be entitled to verdict forms for conspiracy to commit the underlying felony in a felony-murder case, the defense must present evidence sufficient to support a withdrawal defense that would limit liability to the felony. Nor will conspiracy be a lesser included offense when the facts might support the defendants' guilt of the felony on a conspiracy theory, but the prosecution makes no attempt to prove conspiracy. In such a case, the elements of conspiracy are not necessarily included in the elements of the felony murder. Thus, uncharged conspiracy as a theory of liability requires an exception to the usual rule that neither party's choice of strategy can preclude the jury's consideration of a lesser included offense. (See People v. Birks, supra, 19 Cal.4th at p. 127) It is only when the prosecution undertakes the burden of establishing conspiracy as a basis of felony-murder liability that conspiracy becomes a lesser included offense. In that event, the conspiracy is included within the elements the prosecution must prove to establish felony murder, and prosecutorial discretion over which charges to pursue is preserved. (Id. at pp. 132-136.)
These requirements were met in this case. The theory of liability for robbery most strongly supported by the evidence, and most persistently argued by the prosecutor, was conspiracy. At the prosecutor's request, the jury was instructed on the elements of conspiracy. Appellants presented a withdrawal defense that, if believed by the jury, would have permitted them to be *Page 208 
convicted of conspiracy to commit robbery but not of the murder that occurred during the robbery. (See People v. Sconce, supra,228 Cal.App.3d 693, 701-702; 1 Witkin Epstein, Cal. Criminal Law, supra, Elements, § 92, pp. 309-310; CALJIC No. 6.20 (see fn. 6, ante).)[10] Therefore, the jury should have been given the option of returning a verdict on conspiracy as a lesser included offense.
The Attorney General acknowledges there is no difference between the elements of conspiracy as a separate offense and as a theory of vicarious liability. The Attorney General also recognizes that instruction on a lesser included offense "presumably" requires verdict forms for the offense. That requirement is indeed a fundamental assumption underlying our high court's decisions on lesser included offenses. (See, e.g., People v. Birks, supra, 19 Cal.4th at p. 119; People v. Breverman, supra, 19 Cal.4th at p. 161; cf. People v. Daya (1994)29 Cal.App.4th 697, 719.) However, the Attorney General insists that the distinction between conspiracy as a theory of liability and conspiracy as a substantive offense justified the trial court's refusal to provide verdict forms for conspiracy. We disagree.
As explained in People v. Salcedo (1994) 30 Cal.App.4th 209,215-216: "The doctrine of conspiracy plays a dual role in our criminal law. First, conspiracy is a substantive offense in itself — `an agreement between two or more persons that they will commit an unlawful object (or achieve a lawful object by unlawful means), and in furtherance of the agreement, have committed one overt act toward the achievement of their objective.' (People v. Fujita (1974) 43 Cal.App.3d 454, 471 ; Pen. Code, § 182.) Second, proof of a conspiracy serves to impose criminal liability on all conspirators for crimes committed in furtherance of the conspiracy. Thus, `where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. In contemplation of law the act of one is the act of all.' (People v. Kauffman (1907) 152 Cal. 331, 334.) *Page 209 
"This second aspect of conspiracy — which imposes joint liability on conspirators operates independently of the first aspect, which makes a conspiracy itself a crime. Thus, `It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." ' (People v. Belmontes [supra]45 Cal.3d 744, 788-789 , quoting People v. Remiro (1979)89 Cal.App.3d 809, 842 .)"
It is irrelevant to our analysis that conspiracy is both a theory of liability and a substantive offense. The lesser included offense doctrine requires that the jury be permitted to consider all theories on which a necessarily included lesser offense might be established. (People v. Breverman, supra,19 Cal.4th at p. 160.) It is also irrelevant that conspiracy need not be charged as a separate offense for the theory to be invoked at trial. The lesser included offense doctrine applies exclusively to uncharged lesser offenses. California's flexible rules of accusatory pleading permitted the prosecutor to pursue both a conspiracy theory and a felony-murder theory in this case without specifically pleading either. (See People v. Kipp, supra, 26 Cal.4th at p. 1131.) However, that flexibility may not properly be employed to deny appellants the right to verdict forms on conspiracy as a lesser included offense.
Our Supreme Court has noted "the principles of neutrality and mutual fairness which, to a substantial degree, have informed and justified the rule requiring instructions on lesser necessarily included offenses." (People v. Birks, supra,19 Cal.4th at p. 130.) When the prosecutor undertakes to prove a conspiracy as the basis of felony-murder liability, it is not fair for the prosecutor to deny that the elements of the conspiracy are necessarily included in the greater offense of murder.[11]
Nor is it neutral for the court to instruct the jury on conspiracy as a theory of liability, but refuse to provide verdict forms for conspiracy as a lesser offense when the evidence could *Page 210 
support a finding that the defendants' conspiracy liability had terminated before the killing took place.
The Attorney General also relies on felony-murder cases holding that the court need not instruct on the lesser included offenses of the predicate felony. (E.g., People v. Seaton (2001)26 Cal.4th 598, 670.) That authority, which maintains that instruction is required only for offenses necessarily included in charged crimes, is not on point. We are not concerned with whether conspiracy to commit robbery is a lesser included offense of robbery. We hold it is a lesser included offense of the murder charge, because the prosecutor sought a felony-murder conviction based on appellants' participation in a conspiracy to commit robbery.
6. Prejudice
Appellants raise federal constitutional claims both as to the error in barring Nguyen from testifying about statements by others in the van indicating withdrawal from the conspiracy, and the error in omitting a conspiracy offense from the verdict form.[12] However, our Supreme Court has made it clear that these kinds of error violate only state standards. (People v. Cudjo, supra, 6 Cal.4th at pp. 610-612 [exclusion of testimony on hearsay grounds]; People v. Breverman, supra,19 Cal.4th at pp. 164-178 [omission of lesser included offense].) This is not a case where the court excluded all evidence supporting a defense. It misapplied the ordinary rules of evidence in rejecting some evidence, and failed to provide a verdict form for a lesser included offense but did instruct the jury on the withdrawal defense and its application to the charged offenses. In such a case, we must examine the record to determine whether there is a reasonable probability that the errors affected the outcome. (People v. Humphrey (1996) 13 Cal.4th 1073, 1089-1090; People v. Fudge (1994) 7 Cal.4th 1075, 1102-1103; People v. Watson (1956) 46 Cal.2d 818, 836.)[13] *Page 211 
Our review is guided by the Breverman court's explanation of the distinction between review of whether the jury should have been instructed on a lesser included offense and review of the ultimate question of prejudice. "Appellate review under Watson . . . takes an entirely different view of the evidence. Such posttrial review focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result. Accordingly, a determination that a duty arose to give instructions on a lesser included offense, and that the omission of such instructions in whole or in part was error, does not resolve the question whether the error was prejudicial. Application of the Watson standard of appellate review may disclose that, though error occurred, it was harmless." (People v. Breverman, supra, 19 Cal.4th at pp. 177-178, italics in original.)
In this case, the prejudice caused by the court's failure to provide a verdict form for conspiracy to commit robbery magnified the prejudice flowing from the court's undue restriction of Nguyen's testimony. We cannot know the details of what Nguyen might have said about his fellow conspirators' comments on their intentions regarding the imminent invasion of Wintec.[14]
However, it is certain the withdrawal defense was substantially undermined by the court's repeated rulings sustaining the prosecutor's meritless hearsay objections. The extent and the full tenor of the conversations in the Ford van, and between the Ford van and the Pontiac van, were kept from the jury's consideration. On the other hand, the circumstantial evidence supporting the withdrawal defense was considerable. Liu's mother corroborated Nguyen's testimony on the interruption of their planning session, and it was undisputed that the Ford van never entered the Wintec premises. Thus, while the evidence of appellants' participation in the conspiracy was overwhelming, the evidence of their continued participation at the time of the killing was not so *Page 212 
strong as to foreclose a reasonable probability that the court's errors adversely affected the outcome, especially considering that the evidence supporting the withdrawal defense would have been significantly stronger had the court correctly resolved the hearsay issue.[15]
The Attorney General contends appellants suffered no prejudice because the evidence of their withdrawal merely reflected a desire to postpone the robbery for further planning, not an actual withdrawal from the conspiracy. The prosecutor did not make this argument below, and on this restricted factual record we are not prepared to say the evidence of withdrawal was so tentative. Nguyen testified that he told Anh "the plan is no good" and attempted to testify that "[w]e decided not to do it anymore." The other appellants' offer of proof included statements that "it wasn't a good plan to begin with" and they were "no longer willing to go along with the plan." Thus, if Nguyen's testimony had not been improperly limited, the jury would have heard further evidence indicating a decision by appellants to entirely abandon the plan of attack which led to Tsai's death.
The Attorney General also claims the withdrawal defense was "completely undermined by the consciousness of guilt exhibited by the defendants after the crime." We disagree. Appellants' conceded guilt of conspiracy to commit robbery explained their evasive behavior, without contradicting their withdrawal defense. Finally, the Attorney General briefly suggests appellants' intent to withdraw and Nguyen's entire version of the events were belied by Litt's identification of Nguyen's sweater as similar in color to one worn by a gunman on the Wintec premises. However, Litt's testimony was highly inconclusive. Moreover, it is not likely appellants would have been convicted based on a finding of direct participation in the shooting, given the strong evidence that the van they rode in was not the one that invaded Wintec.
If the court had provided verdict forms for conspiracy to commit robbery, the jury could have weighed that charge, on which appellants conceded their guilt, together with the strenuously disputed charge of felony murder. The prosecutor would not have been able to exploit the jury's all-or-nothing choice between murder and acquittal, a situation our Supreme Court has repeatedly condemned for its tendency to distort the jury's truth-finding function. (See, e.g., People v. Breverman, supra,19 Cal.4th at p. 155; People v. Barton (1995) 12 Cal.4th 186,197; *Page 213 
People v. St. Martin (1970) 1 Cal.3d 524, 533.) The prosecutor took full advantage of the error, advising the jury that if it believed the appellants' withdrawal defense, it should "let them walk." The error in the verdict forms, coupled with the evidentiary error, seriously weakened the withdrawal defense. Had those errors not occurred, it is reasonably probable that appellants could have raised a reasonable doubt on the murder charge.
 DISPOSITION
The judgments are reversed.
I concur:
McGUINESS, P.J.
[1] In his police report, Alameda had included the sketches of the Wintec building among the factors he relied on for probable cause to arrest the occupants of the van. However, both at the preliminary hearing and at the motion to suppress in the trial court, Alameda testified that his report was mistaken, and the arrest had actually preceded the opening of the folder containing the sketches. Defense counsel closely cross-examined Alameda on this discrepancy, and on his discussions with members of the District Attorney's office concerning the sequence of events during the stop.
[2] Tangha briefed the suppression issue for the first time in a supplemental brief.
[3] Nguyen filed a petition for writ of habeas corpus claiming ineffective assistance of counsel based on his trial counsel's concession of the legality of the stop. We have denied the petition, filed under Case No. A102448, by a separate order filed this date.
[4] Alameda testified that he did not take any further action to place appellants under arrest before the folder was opened; it was only "in [his] mind that they were under arrest." We note that "the determination of whether a Fourth Amendment violation has occurred hinges upon an objective assessment of the officer's actions in light of the circumstances at the time of the search, not upon an assessment of the officer's actual state of mind." (People v. Gallegos (2002) 96 Cal.App.4th 612, 627.)
[5] Evidence Code section 502 provides: "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt."
[6] We reject Liu's argument that CALJIC 6.20 suggested that appellants bore the burden of proving withdrawal. The jury was told:
 "A member of the conspiracy is liable for the acts and declarations of his co-conspirators until he effectively and affirmatively withdraws from the conspiracy or the conspiracy has terminated.
 "In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy, which must be communicated to the other conspirators of whom he has knowledge.
 "If a member of a conspiracy has effectively withdrawn from the conspiracy, he is not thereafter liable for any act of the co-conspirators committed after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member."
Nothing in this instruction even remotely implicates the burden of proof at trial.
[7] We agree with our concurring colleague that it is problematic to assign the "burden of proof" to the defendant on any defense aimed at negating an element of the crime. Such a formulation seems to be required under Mower and the Evidence Code, however.
[8] Thus, we need not concern ourselves with the Attorney General's warning that if conspiracy to rob is a lesser related offense of murder, a conspiracy conviction would preclude a murder conviction. (See People v. Geiger (1984) 35 Cal.3d 510,528; People v. Miller (1994) 28 Cal.App.4th 522, 527.) The Geiger rule requiring instruction on lesser related offenses is defunct. (People v. Birks, supra, 19 Cal.4th at p. 136.)
[9] The record does not support the Attorney General's claim that the jury was also instructed on deliberate, premeditated murder.
[10] In determining whether the evidence supporting a lesser included offense is "substantial" enough to warrant its submission to the jury, a court considers only the bare legal sufficiency of the evidence, not its weight. The standard is met if a reasonable jury could conclude that the lesser offense was established, but not the greater offense. (People v. Breverman, supra, 19 Cal.4th at p. 177.) Here, while he was not permitted to go into detail, Nguyen testified in conclusory terms that everyone in the Ford van agreed not to go forward with the robbery. Telephone records established communication between that van and the Pontiac van that did enter Wintec's premises, and Nguyen said the withdrawal of those in the Ford was communicated to their coconspirators in the Pontiac. The Ford van was never seen by the witnesses at Wintec. This evidence meets the minimum standard for submission of a lesser included offense to the jury.
[11] Lee renews the contention made below that the prosecutor committed misconduct by relying on a conspiracy theory to obtain murder convictions while objecting to the inclusion of conspiracy on the verdict forms as a lesser included offense. We reject the notion that this tactic was a deceptive or reprehensible method of persuasion rising to the level of prosecutorial misconduct. (People v. Hill (1998) 17 Cal.4th 800, 819.) While we conclude the court erred by not providing verdict forms for conspiracy, the application of the lesser included offense rule in the unusual circumstances of this case was far from obvious.
[12] We note that Liu appears to be in a different position, factually, from the other appellants, since he was not in the van where Nguyen claimed the other four discussed abandoning the plan to invade Wintec. (Nguyen said the plan never included Liu's participation in the actual invasion.) Liu's claim of error is based on the court's ruling limiting the use of Nguyen's testimony that he was happy when he heard Liu say "Just forget this, call it off. We're not going to do it." Nguyen is also uniquely situated, since he was permitted to testify regarding his own statements and state of mind bearing on the withdrawal defense. However, the Attorney General has made no effort to distinguish among the appellants for purposes of the prejudice analysis. Given this implicit concession that all appellants were equally affected by the trial court's rulings, we refrain from carving out exceptions on our own initiative.
[13] At oral argument, Liu's counsel advised us we would find the appropriate standard of review in People v. Ramkeesoon (1985)39 Cal.3d 346. Not so. Ramkeesoon applied a California standard requiring reversal unless it could be determined that the factual question posed by an omitted lesser included offense instruction was necessarily resolved against the defendant under other, proper instructions. (Id. at pp. 351-352.) That standard of review was repudiated in Breverman as a violation of article VI, section 13 of the California Constitution. (People v. Breverman, supra, 19 Cal.4th at p. 176.) The Breverman court also noted that the decisions of the United States Supreme Court "leave substantial doubt that the federal Constitution confers any right to lesser included offense instructions in noncapital cases." (Id. at p. 168, italics in original; see also p. 166, fn. 14.)
[14] Appellants' offers of proof were stated in general terms, indicating that Nguyen would have related expressions of concern about the lack of opportunity to review the plan, the possibility that Liu's mother had seen appellants, the fact that the groupings of conspirators in the two vans were not the same as those originally contemplated, the number of people and vehicles they found at Wintec, and the ultimate feasibility of the plan.
[15] The jury was also instructed on withdrawal as a defense to felony-murder liability on an aiding and abetting theory. (CALJIC No. 3.03; see People v. Norton (1958) 161 Cal.App.2d 399,403.) The prosecutor argued the aiding and abetting theory to the jury, but made it clear he believed the conspiracy theory was better suited to the facts. The Attorney General does not contend the convictions should stand on the aiding and abetting theory. In any event, we note the court's erroneous hearsay ruling also had a debilitating effect on the defense of withdrawal in the aiding and abetting context.